# TRANSCRIPT OF JUDGMENT DEBTOR EXAM

EXHIBIT B

# ORIGINAL

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 92 CR 652-5 |
| | ) |
| ROBERT J. TEZAK, | ) |
| | ) |
| Defendants. | ) |

       The deposition of ROBERT J. TEZAK, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Kathy A. O'Donnell, Certified Shorthand Reporter in the State of Illinois, at 219 South Dearborn Street, Suite 500, Chicago, Illinois, commencing at 10:45 a.m. on the 19th day of January, 2011.

**2**

```
1   APPEARANCES:

2   UNITED STATES ATTORNEY'S OFFICE
    219 South Dearborn Street
3   Suite 500
    Chicago, Illinois 60604
4   Phone: (312) 353-5331
    BY: MS. MELISSA A. CHILDS
5   melissa.childs@usdoj.gov

6       On behalf of the Plaintiff;

7   LAW OFFICE OF DANIEL E. RADAKOVICH
    900 West Jackson Boulevard
8   Suite 5-E
    Chicago, Illinois 60607
9   Phone: (312) 733-5116
    BY: MR. DANIEL E. RADAKOVICH
10  dradak@aol.com

11      On behalf of the Defendant.

12  ALSO PRESENT: Ms. Llaniret Sanchez

13

14              * * * * * *

15

16

17

18

19

20

21

22

23

24

25  Reported By: Kathy A. O'Donnell, CSR No. 084-004466
```

**3**

```
1                I N D E X

2   WITNESS                              PAGE

3   ROBERT J. TEZAK

4       Examination by Ms. Childs .......... 4

5

6                E X H I B I T S

7   TEZAK DEPOSITION EXHIBIT              PAGE

8       No. 1  ...............................   5

9       No. 2  ...............................   7

10      No. 3  ...............................  46

11      No. 4  ...............................  59

12      No. 5  ...............................  72

13      No. 6  ...............................  77

14      No. 7  ...............................  82

15      No. 8  ...............................  84

16      No. 9  ...............................  87

17      No. 10 ...............................  90

18      No. 11 ...............................  92

19      No. 12 ............................... 105

20      No. 13 ............................... 117

21      No. 14 ............................... 127

22      No. 15 ............................... 151

23      No. 16 ............................... 176

24

25
```

**4**

```
1              (Witness sworn.)

2       MS. CHILDS:  This is the deposition of

3   Robert J. Tezak, a judgment debtor exam, taken

4   pursuant to the Federal Debt Collection

5   Procedures Act and the Federal Rules of Civil

6   Procedure.

7   WHEREUPON:

8              ROBERT J. TEZAK,

9   called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11              EXAMINATION

12  BY MS. CHILDS:

13      Q.  Mr. Tezak, would you please state and spell

14  your name for the record?

15      A.  Yes.  Robert J. Tezak, T-E-Z-A-K.

16      Q.  And have you been deposed or given testimony

17  in a trial or hearing before?

18      A.  Yes.

19      Q.  On how many occasions?

20      A.  I don't know, half a dozen or so.

21      Q.  Okay.  How recently?

22      A.  It's been some time.

23      Q.  Just a brief reminder, then, for how our

24  proceedings will work today.  I will be asking

25  questions.  You will be giving answers.  It's
```

**5**

```
1   important that you make sure you understand each of

2   my questions before you give an answer.  If you don't

3   understand it, ask me to repeat or rephrase it, and

4   I'll be happy to do so.  It's also important you let

5   me finish each question before you begin your answer

6   because it is difficult for the court reporter to

7   take down two people speaking at the same time.

8   Likewise, it's important that you answer each

9   question out loud with words because it's also

10  difficult to take down gestures, nods of the head,

11  and so on and so forth.  If you need to take a break

12  at any time, let us know and we'll be glad to

13  accommodate you.  My only request is if there is a

14  question pending, that you would answer that question

15  prior to taking a break.

16      So do you understand those kind of --

17      A.  Yes.

18      Q.  -- ground rules for today's proceedings?

19      A.  Yes.

20      MS. CHILDS:  I'd ask the court reporter to

21  mark this Exhibit No. 1.

22              (Tezak Deposition Exhibit No. 1

23               marked for identification.)

24  BY MS. CHILDS:

25      Q.  Mr. Tezak, will you take a look at this
```

6

1  document?
2 A. Yes.
3 Q. Do you recognize it?
4 A. Yes.
5 Q. What is this?
6 A. It's a notice to appear.
7 Q. Are you appearing here today pursuant to
8  this notice to appear for a judgment debtor
9  examination?
10 A. Yes.
11 Q. Did you bring with you the documents that
12  are requested in this notice?
13 A. Yes.
14 Q. We will review those at a later point today.
15  Did you make copies, or do we need to make copies of
16  what you have?
17 A. I think I have most of them copied.
18 Q. I just wanted to know whether we need to
19  give that to anyone to copy right now.
20 A. No.  I think I have all of them.
21 Q. Okay, great.  So we'll review those
22  momentarily.
23  MS. CHILDS:  If I may have the court
24  reporter mark this as No. 2.
25

7

1  (Tezak Deposition Exhibit No. 2
2  marked for identification.)
3  BY MS. CHILDS:
4 Q. Mr. Tezak, we're showing you what's been
5  marked as Exhibit No. 2.  Do you recognize this
6  document?
7 A. Yes, I believe so.
8 Q. What is this?
9 A. A petition on probation and supervised
10  release.
11 Q. Okay.  And is it your understanding that
12  this probation report is pending before the district
13  court for which we have a hearing tomorrow morning?
14 A. Yes.
15 Q. Have you had an opportunity to review this
16  report?
17 A. Yes, I believe so.
18 Q. Okay.  So this is another of the topics
19  we'll be covering today in addition to the documents
20  you brought with you on the notice to appear.
21  Mr. Tezak, where do you currently reside?
22 A. In Mesa, Arizona.
23 Q. At what address?
24 A. 2340 South Standage.
25 Q. How long have you been at 2340 South

8

1  Standage?
2 A. Approximately seven years.
3 Q. And so have you been residing at that
4  address since you were released from the Bureau of
5  Prisons?
6 A. Yes.
7 Q. Could you describe that property for me?
8 A. It's a single-family residence.
9 Q. Do you own the home in which you live?
10 A. No.  My mother and father own it.
11 Q. Had you ever owned the property at
12  2340 South Standage?
13 A. No.
14 Q. How long have your parents owned that
15  address?
16 A. It was approximately 1979 or 1980.  I think
17  when we originally got it there was some mix-up, and
18  it went into my name and my ex-wife's name or
19  something like that, which it was never intended to
20  be that way.  It was subsequently fixed and changed
21  years and years ago.
22 Q. So at some point in time the property at
23  2340 South Standage was in your name and your ex-wife
24  Nancy Tezak's name?
25 A. No.  It would be Sandra.

9

1 Q. I'm sorry.  Sandra.
2 A. It was years and years ago.
3 Q. How did it get from your name and your
4  ex-wife's name into your parents' names?
5 A. We just had it corrected.  I'm not positive
6  that that's the course of what -- that's the best I
7  can recollect that's what happened.
8 Q. Have you contributed any funds to the down
9  payment for the purchase of that property?
10 A. No, I don't believe so.
11 Q. What about any mortgage payments over the
12  years?
13 A. No.  My mother and father made them.
14 Q. Do you pay rent to your parents?
15 A. No.
16 Q. Do you contribute to any of the household
17  expenses or bills at that location?
18 A. No.  I just am there and I take care of
19  them.  They're elderly, 93 and 87 -- 92 and 87.
20 Q. What is your father's name?
21 A. Quentin.
22 Q. Quentin Tezak?
23 A. Yes.
24 Q. What is his age?
25 A. He's 92.

10

1   Q.   What is your mother's name?
2   A.   Betty.
3   Q.   Betty Tezak?
4   A.   Yes.
5   Q.   What is her age?
6   A.   87.
7   Q.   So who else resides with you and your
8   parents at 2340 South Standage?
9   A.   No one.
10  Q.   Has anyone else ever lived there?
11  A.   No.
12  Q.   And where do you live within the home?
13  A.   I have my own room.  Basically, in the whole
14  home.
15  Q.   How often do you stay there?
16  A.   All the time.
17  Q.   Have you ever maintained a residence
18  elsewhere?
19  A.   No.
20  Q.   Do you have a driver's license or money
21  clip?
22  A.   Yes.
23  Q.   May I see it?
24       So this is an Illinois driver's license --
25  A.   Yes.

11

1   Q.   -- with an address of 1211 Plainfield Road?
2   A.   Yes.
3   Q.   In Joliet, Illinois --
4   A.   Yes.
5   Q.   -- 60435?
6   A.   Correct.
7   Q.   Is this your current driver's license?
8   A.   Yes.
9   Q.   And this was issued in September of 2006?
10  A.   Yes.
11  Q.   Expires in February 2011; is that correct?
12  A.   Yes.
13  Q.   If you've been residing at 2340 South
14  Standage for the last seven years, why do you have an
15  Illinois driver's license?
16  A.   Well, when I was first released, I was
17  released to Illinois.  That's when I got the license.
18  I just never changed it since then.  Actually, it's
19  up now for me to change in February.
20  Q.   Do you have an Arizona driver's license as
21  well?
22  A.   No, I don't.
23  Q.   Have you ever had an Arizona driver's
24  license?
25  A.   Years and years ago.

12

1   Q.   During what time period would that have
2   been?
3   A.   Goodness, late '70s, early '80s.
4   Q.   I see there are a bunch of credit cards as
5   well.
6   A.   Yes.
7   Q.   And we will review some of your credit card
8   records.  I just want to lay these out for us.  Do
9   you have any cash?
10  A.   Yes.
11  Q.   How much cash do you have with you?
12  A.   I'm not sure.  About $300.
13  Q.   From what account do you obtain cash?
14  A.   It would be from salary; and for this
15  particular trip, my parents had given me cash.
16  Q.   Is there a particular bank account from
17  which you draw money?
18  A.   No, not any particular one.
19  Q.   Do you have an ATM card or a debit card that
20  you use?
21  A.   Just these, the business cards.
22  Q.   And so you're referring to -- there are two
23  Chase business debit cards here?
24  A.   Yes.
25  Q.   One is for Robert J. Tezak of Tezak

13

1   Investment Corp., and this other one is Mark Tezak
2   for --
3   A.   Yes.
4   Q.   -- Tezak Investment Corp.?
5   A.   That's in there by mistake.
6   Q.   Apart from these two accounts at Chase, are
7   there any other ATM or debit cards that you use?
8   A.   Well, these three are all debit cards.
9   Q.   Okay.  So we have a Visa debit card in the
10  name of Betty A. Tezak, a Visa debit card in the name
11  of Quentin R. Tezak, and a Mastercard debit card in
12  the name of Betty A. Tezak?
13  A.   Yes.
14       MR. RADAKOVICH:  Melissa, may I suggest that
15  on these cards we identify, like, the last four
16  numbers --
17       MS. CHILDS:  Certainly.
18       MR. RADAKOVICH:  -- for identification
19  purpose.
20       MS. CHILDS:  I actually plan to make copies
21  of these to make an exhibit, but I agree that's
22  prudent.
23       Referring back to the business debit cards
24  from Chase, the one in the name of Robert J.
25  Tezak for Tezak Investment Corp. is card number

USA VS. TEZAK                           DEP OF:   ROBERT J. TEZAK, 1/19/11

---

14

1      ending in 2671.  The card issued for Mark Tezak
2   of Tezak Investment Corp. is a card ending in
3   0195.  Turning then to the cards for Betty A.
4   Tezak, the Visa debit card ends in 3990, and the
5   Mastercard debit card ends in 4736.  For
6   Quentin R. Tezak, the Visa debit card ends in
7   number 1925.
8          MR. RADAKOVICH:  Thank you.
9   BY MS. CHILDS:
10     Q.    So in terms of using these debit cards or
11  ATMs to access cash or for personal expenses, why do
12  you have cards for your parents in your wallet?
13     A.    For this trip and for -- they ask me to get
14  cash for them, which I will do, or ask me to take
15  care of different things for them, which I do.
16     Q.    Okay.  So do you carry these on a daily
17  basis?
18     A.    Most of the time.
19     Q.    How about the business debit cards for Tezak
20  Investment Corp., do you also carry these --
21     A.    Yes.
22     Q.    -- on a daily basis?
23     A.    Yes.
24     Q.    From which accounts do the Chase debit cards
25  for Tezak Investment Corp. withdraw money?

---

15

1      A.    Excuse me?
2      Q.    Which bank accounts are these pegged to?
3      A.    Tezak Investment Corp.
4      Q.    And what about the debit card for Quentin
5   Tezak, from which account does this --
6      A.    That's from their personal accounts.
7      Q.    At which bank or which account?
8      A.    That would be Bank of America.
9      Q.    What about Betty's Visa debit card, from
10  which account?
11     A.    Bank of America.
12     Q.    And how about her Mastercard debit card,
13  which account?
14     A.    Bank of America.
15     Q.    Are any of these cards the ones that you
16  used during your July visit to Illinois?
17     A.    I can't be sure.  I don't think so, but I'm
18  not sure.
19     Q.    If they didn't -- If none of these cards
20  that you've presented today are the ones that you
21  used during your visit here in July this past summer,
22  which ATM or debit card might you have used?
23     A.    I would have used this for sure, the Tezak
24  Investment Corp., because it was a business trip.
25     Q.    What is 2 Biltmore Estates, No. 103?

---

16

1      A.    That is a condominium unit that's owned by
2   Tezak Investment Corporation.
3      Q.    When was it purchased?
4      A.    I believe 2007.
5      Q.    What was the purchase price?
6      A.    $2.4 million.
7      Q.    How much was put down at the time of
8   purchase?
9      A.    I don't remember.
10     Q.    What would be the source of funds for the down
11  payment --
12     A.    Well, there's --
13     Q.    -- have been?
14     A.    -- 75 percent owned by Tezak Investment
15  Corp.  Actually, 75 percent owned by Tezak Investment
16  Corp. and 25 percent owned by other investors -- or
17  investor.  They put in cash of 600,000.  And there's
18  a mortgage of 1 million, 8.
19     Q.    So 600,000 down for the property at
20  2 Biltmore Estates, Unit No. 103.  You said that
21  600,000 down came from other investors?
22     A.    Yes.
23     Q.    Who are those investors?
24     A.    Well, one investor, Mark Renfro.
25     Q.    Who is Mark Renfro?

---

17

1      A.    He's a doctor.
2      Q.    Where does he live?
3      A.    In Texas.
4      Q.    Texas?
5      A.    Mm-hmm.
6      Q.    A particular address?
7      A.    I couldn't tell you.
8      Q.    City?
9      A.    I think Dallas.
10     Q.    Okay.  How do you know Mr. Renfro?
11     A.    Just an acquaintance through other friends.
12     Q.    And so how much of 2 Biltmore Estates,
13  Unit 103, does Mr. Renfro own?
14     A.    25 percent.
15     Q.    Who owns the other 75 percent?
16     A.    Tezak Investment Corporation.
17     Q.    Who are the officers, directors, or
18  shareholders of Tezak Investment Corporation?
19     A.    Well, it would be different.
20     Q.    What do you mean?
21     A.    Well, the officers and shareholders are
22  different.
23     Q.    Okay.  Who are the officers of Tezak
24  Investment Corporation?
25     A.    It would be myself, my son, Mark, my

---

USA VS. TEZAK                          DEP OF:  ROBERT J. TEZAK, 1/19/11

18

1    daughter, Tiffany, and my mother and father.
2        Q.   What office do you hold with Tezak --
3        A.   President.
4        Q.   -- Investment Corporation?  President?
5        A.   President and general manager.
6        Q.   And what role does your son, Mark, hold with
7    the corporation?
8        A.   Mark was involved in it for a long time as
9    CEO, but he's been very ill.  He now is vice
10   president.
11       Q.   And how about your daughter, Tiffany, what
12   is her role in Tezak Investment Corp.?
13       A.   Chief executive officer.
14       Q.   And you also mentioned your parents have
15   some interest in the corporation?
16       A.   Yes.  I believe my mother is vice president
17   and secretary, and my father is vice president and
18   treasurer.
19       Q.   So what do you do for Tezak Investment Corp.
20   as its president?
21       A.   I run the day-to-day operation.
22       Q.   What does Mark do as its vice president?
23       A.   At the moment he just attend meetings, not
24   much because of his condition.
25       Q.   How about Tiffany as CEO, what does she do?

19

1        A.   Tiffany is there all the time and just takes
2    care of the executive end, bookkeeping and
3    check-paying and those kind of thing.
4        Q.   When you say she's "there all the time" --
5        A.   At the office.
6        Q.   -- to where are you referring?
7        A.   The office.
8        Q.   Where is the office of Tezak --
9        A.   The office is also located at 2340 South
10   Standage.
11       Q.   And what does your mother do in her role as
12   secretary and vice president?
13       A.   And director.  She doesn't do anything
14   outside of meetings and if there's documents that
15   need to be signed.
16       Q.   And how about your father, what does he do
17   in his role as vice president and treasurer?
18       A.   Same.
19       Q.   Same thing, which is --
20       A.   Which would be board meetings or any
21   documents that need to be signed.
22       Q.   Okay.  What is the business of Tezak
23   Investment Corporation?
24       A.   Real estate development.
25       Q.   So what are its real estate holdings?

20

1        A.   We have condos at Biltmore and farmland.
2        Q.   When you say "condos at Biltmore," to which
3    properties are you referring?
4        A.   Unit 103, Unit 107, and three farms.
5        Q.   Where are the farms located?
6        A.   Eloy, Arizona.
7        Q.   Can you spell that for me?
8        A.   E-L-O-Y.
9        Q.   Can you describe for me what the property
10   looks like at 2 Biltmore Estates, Unit No. 103?
11       A.   It's a large ground-floor condominium in a
12   gated small community.
13       Q.   And so how many square feet?  How many
14   bedrooms?
15       A.   It has three bedrooms and approximately, I
16   believe, 3,800 square feet, three bedrooms in one
17   section.  It has a detached section, what they call a
18   casita, that has another bedroom.
19       Q.   Who resides at 2 Biltmore Estates, Unit
20   No. 103?
21       A.   It's leased out, so various people.
22       Q.   When you say it's "leased out" to various
23   people, how is that done?
24       A.   Through VRBO mainly, or if realtors come to
25   us, either way.

21

1        Q.   What is VRBL [sic]?
2        A.   Vacations By Rental -- or Vacation Rentals
3    By Owner.
4        Q.   Vacation Rentals By Owner?
5        A.   Yes.
6        Q.   Is it currently occupied?
7        A.   Yes, it is.
8        Q.   Who is there now?
9        A.   I believe there's a fellow there by the name
10   of Charles -- last name is escaping me right now.
11   But it's had multiple tenants.  He's there for a
12   week.  There was somebody else the week before that.
13   It's rented from a week up to a couple months.
14       Q.   So rented on a weekly to monthly basis?
15       A.   Yes.
16       Q.   To whom is the rent paid?
17       A.   Tezak Investment Corporation.
18       Q.   How is the rent determined?
19       A.   We have a rental scale depending on the
20   length of the lease, anywhere from $7,500 up to
21   10,000 a month.
22       Q.   Would the rent always be paid to Tezak
23   Investment Corp.?
24       A.   Yes.
25       Q.   What does the corporation do with the rent

USA VS. TEZAK                     DEP OF: ROBERT J. TEZAK, 1/19/11

22

1    upon receipt?
2        A.    Takes care of their obligations.
3        Q.    And what are the corporation's obligations?
4        A.    Day-to-day operations: salaries, bills,
5    mortgages.
6        Q.    Okay. How much is the mortgage payment on
7    2 Biltmore Estates, Unit No. 103?
8        A.    Approximately $8,000.
9        Q.    And how much is the mortgage payment on
10   8 Biltmore Estates, Unit No. 107?
11       A.    Approximately $5,000.
12       Q.    What is your salary for Tezak Investment
13   Corporation?
14       A.    My salary from Tezak Investment Corporation
15   is approximately $900 a month, but it's not in cash.
16   It's in health insurance, life insurance, expenses
17   that they pay for me.
18       Q.    Who carries your health insurance?
19       A.    Blue Cross/Blue Shield.
20       Q.    Who carries your life insurance?
21       A.    New York Life and Prudential.
22       Q.    Is the life insurance at New York Life and
23   Prudential term insurance or whole life insurance?
24       A.    It's whole life insurance.
25       Q.    So is there cash value to either policy?

23

1        A.    There is, but it's minimal.
2        Q.    Why is that?
3        A.    It has loans out against it.
4        Q.    You mentioned expenses of the corporation
5    include mortgages for the properties, salaries for
6    officers. How much is Mark paid from Tezak
7    Investment Corp. as salary?
8        A.    Mark, at this point, has insurance and gets
9    a minimal salary.
10       Q.    And so is Mark's insurance also health
11   insurance and life insurance?
12       A.    No, just health.
13       Q.    Just health insurance. What about Tiffany,
14   what's her salary from the corporation?
15       A.    Tiffany's salary is approximately, I think,
16   $2,500.
17       Q.    2,500?
18       A.    Yes, per month.
19       Q.    Per month. Does she receive any health
20   insurance, life insurance, other benefits from --
21       A.    Yes. She has health insurance as well.
22       Q.    Any life insurance or other benefits from
23   Tezak Investment Corporation?
24       A.    Not that I'm remembering.
25       Q.    What about your mother, Betty Tezak, what

24

1    salary does she receive from Tezak Investment --
2        A.    She doesn't receive a salary.
3        Q.    How about your father, Quentin Tezak, what
4    salary --
5        A.    He doesn't receive a salary.
6        Q.    So apart from salary and mortgage which we
7    just covered, what other expenses would the
8    corporation be paying from its rental receipts?
9        A.    Anything related to the condo units:
10   electric, gas, water.
11       Q.    Okay. So those --
12       A.    Maintenance, we have maintenance people. If
13   we have any maintenance on any of the units or any of
14   the properties, it's paid by the company.
15       Q.    Okay. What is 8 Biltmore Estates, Unit
16   No. 107? Can you describe that property to us?
17       A.    It's an approximately 1,800 square foot
18   condominium which has two bedrooms.
19       Q.    And who owns that property?
20       A.    Tezak Investment Corporation.
21       Q.    When was it purchased?
22       A.    2005 or -6.
23       Q.    And how much was put down at the time of
24   purchase?
25       A.    I don't recall.

25

1        Q.    But you mentioned there's a mortgage on that
2    property for about 5,000 a month?
3        A.    Yes.
4        Q.    So who holds the mortgage on that property?
5        A.    I think Bank of America.
6        Q.    And is there just a primary mortgage, or is
7    there also a second mortgage on this property?
8        A.    There's a primary and a secondary.
9        Q.    Does Bank of America hold both of those?
10       A.    Yes.
11       Q.    What do you estimate the current market
12   value of 8 Biltmore Estates, Unit No. 107, to be?
13       A.    I'm not really sure what it is at this point
14   with the economy like it is now. I believe we were
15   somewhere around a million dollars when things were
16   going well.
17       Q.    How much did Tezak Investment Corp. pay for
18   it in '05 or '06?
19       A.    I believe 798,000.
20       Q.    How much is owed on the property today?
21       A.    Approximately 600,000.
22       Q.    So what do you estimate the equity on that
23   property to be?
24       A.    Right now it's probably worth somewhere
25   around between 6- and 700,000.

USA VS. TEZAK                    DEP OF: ROBERT J. TEZAK, 1/19/11

26

1   Q.   Are the mortgage payments current?  Is there
2  any arrearage on that property?
3   A.   We are not current on that property.  We are
4  not current on 103.
5   Q.   Have there been any foreclosure proceedings
6  initiated against 8 Biltmore Estates, Unit No. 107?
7   A.   Not to my knowledge.
8   Q.   And how about 2 Biltmore Estates, Unit
9  No. 103?
10   A.   Yes, there is foreclosure proceedings.
11   Q.   What do you estimate the market value of
12  that property to be?
13   A.   I'm not sure.  Probably somewhere around a
14  million and a half dollars, I guess.
15   Q.   How much is owed on it?
16   A.   A million, 8.
17   Q.   So what do you estimate the equity on that
18  property to be?
19   A.   There is none.
20   Q.   Just underwater?
21   A.   Yes.
22   Q.   What's the current status of the foreclosure
23  proceedings against it?
24   A.   It's being negotiated now by a third party.
25  It's due for foreclosure next week, so we're trying

27

1  to head that off.
2   Q.   Are you trying to negotiate some kind of
3  short sale or something?
4   A.   No.  We're trying to renegotiate a mortgage
5  or come up with the money to make it current.
6   Q.   And with which lender are you dealing with
7  that property?
8   A.   I don't know who the lender is.  It's being
9  handled by a mortgage broker.
10   Q.   Who is the mortgage broker?
11   A.   Allen Sanders.
12   Q.   Ellen [sic] Sanders?
13   A.   Yes.
14   Q.   For which entity does she work?
15   A.   It's a gentleman who has his own company.
16   Q.   So is it Allen or --
17   A.   Yes, A-L-L-E-N.
18   Q.   Not Ellen?
19   A.   Right.
20   Q.   Allen, male; not Ellen, female?
21   A.   Right.
22   Q.   What was the name of his company?
23   A.   Allen Sanders & Associates, I believe.
24   Q.   Where is he located?
25   A.   In Arizona, Phoenix.

28

1   Q.   Phoenix?
2   A.   Yes.
3   Q.   And what about 2340 South Standage, is
4  that -- you described that as a single-family home?
5   A.   Yes.
6   Q.   Is that owned outright, or are there any
7  mortgages on it?
8   A.   It has an equity line of credit of 300,000
9  against it.
10   Q.   Let's review -- We've discussed a bit about
11  Tezak Investment Corp., which, if I understand your
12  testimony correctly, you are the president of Tezak
13  Investment Corp. and responsible for its day-to-day
14  operations?
15   A.   Yes.
16   Q.   And you have family members who are officers
17  of the corporation, the only one of whom is paid a
18  salary from Tezak Investment Corp. would be your
19  daughter, Tiffany; is that correct?
20   A.   Yes.
21   Q.   And so your family members have -- Is it a
22  fair statement that your family members have a lesser
23  role in the operations of Tezak Investment Corp. than
24  you do as its president?
25   A.   Well, Tiffany has a major role, and so do I.

29

1   Q.   Is Tezak Investment Corporation currently in
2  good standing?
3   A.   To my knowledge, it is.
4   Q.   And what is Tiffmark Network, Inc.?
5   A.   That's another family corporation that is a
6  credit card processing provider and ATM provider.
7   Q.   And so what is its business?  What does
8  Tiffmark Network, Inc., do?
9   A.   Credit card processing and ATMs.
10   Q.   Credit card processing for all of the major
11  credit card providers?
12   A.   Yes, for businesses, where you get your
13  machine and, you know, swipe the machine.  There's a
14  processor for that.  That's what we do.
15   Q.   Who are the officers of Tiffmark Network,
16  Inc.?
17   A.   It would be the same as Tezak Investment
18  Corporation.
19   Q.   So does each of your family members serve in
20  the same capacity for Tiffmark Network, Inc., as they
21  do for Tezak Investment Corporation?
22   A.   That's correct.
23   Q.   So you would be a president responsible for
24  day-to-day operations?
25   A.   Yes.

USA VS. TEZAK              DEP OF:  ROBERT J. TEZAK, 1/19/11

---

**30**

1    Q.   And your son, Mark, is a vice president?

2    A.   Yes.

3    Q.   And what is his role?  What does he do for

4 Tiffmark Network, Inc.?

5    A.   Well, at this point nothing.  It's not

6 really -- it's an operating company because we've had

7 accounts that date back some time, but it's not been

8 actively pursued.

9    Q.   Tiffany, what is her role in Tiffmark

10 Network, Inc.?

11   A.   CEO.

12   Q.   What are her duties and responsibilities as

13 its CEO?

14   A.   The same, bill-paying, office -- whatever

15 needs to be taken care of as far as office work.

16   Q.   And what about your mother, Betty Tezak?

17   A.   Same.  She's a director and documents that

18 require a secretary or vice president.

19   Q.   And how about your father, Quentin Tezak?

20   A.   The same, documents requiring a treasurer or

21 VP, or cosigners.

22   Q.   What salary are you paid from Tiffmark

23 Network, Inc.?

24   A.   $200 per month.

25   Q.   How much salary does Tiffany get from that

---

**31**

1 corporation?

2    A.   Tiffany doesn't get -- I don't think they

3 get anything.

4    Q.   Do any of your family members receive any

5 compensation from Tiffmark Network, Inc.?

6    A.   No.  It's a very, very low income on it.

7 They might take in $500 a month.

8    Q.   So you estimate the accounts receivable for

9 Tiffmark Network, Inc., to be about 500 per month?

10   A.   Yes, approximately.

11   Q.   And 200 of that is paid to you as salary?

12   A.   Yes.

13   Q.   What are the expenses or obligations of

14 Tiffmark Network, Inc.?

15   A.   They don't have, really, any expenses

16 outside of salary and general bookkeeping.

17   Q.   Where is it located?

18   A.   Same address, 2340 South Standage.

19   Q.   So both Tezak Investment Corp. and Tiffmark

20 Network, Inc., are operated from your parents' home

21 at 2340 South Standage?

22   A.   Yes.

23   Q.   Any other office space anyplace else?

24   A.   No.

25   Q.   Any post office boxes or locations that

---

**32**

1 use -- either of those corporations use to receive

2 correspondence?

3    A.   No.

4    Q.   And where does Tezak Investment Corporation

5 maintain any bank accounts?

6    A.   At Chase.

7    Q.   All of Tezak Investment Corp's accounts are

8 at Chase?

9    A.   Yes.

10   Q.   How about Tiffmark Network, Inc., where are

11 its accounts?

12   A.   At Chase.

13   Q.   Also at Chase?

14   A.   Yes.

15   Q.   Any other bank or financial institution

16 where either Tezak Investment Corporation or Tiffmark

17 Network, Inc., maintains any accounts?

18   A.   Not that I can recall.

19   Q.   What is Tiffmark Vending, Inc.?

20   A.   Tiffmark Vending, Inc., is really a

21 non-operating company.  It was going to be, like, a

22 vending company, but it never got off the ground.

23   Q.   Okay.  And who are its officers?

24   A.   It would be the same as Tezak Investment

25 Corporation and Tiffmark.

---

**33**

1    Q.   Does Tiffmark Vending, Inc., have any

2 inventory or assets?

3    A.   No.  I don't even believe it's a valid

4 corporation anymore.

5    Q.   Any accounts receivable?

6    A.   No.

7    Q.   Any liabilities of Tiffmark Vending, Inc.?

8    A.   No.

9    Q.   What is Alstec, Inc., A-L-S-T-E-C Inc.?

10   A.   That's another corporation that was going to

11 be used for real estate purchases, and I don't

12 believe that corporation ever began operating.  I

13 really don't know because I'm not involved in that

14 corporation.  It was taken care of by somebody else.

15 I mean, I'm involved in it, but it's taken care of by

16 somebody else.  I don't think it was ever used.

17   Q.   What is your role in Alstec, Inc.?

18   A.   I don't have any.

19   Q.   Well, you said you're taking care of it.

20 What does that mean?

21   A.   No.  I said someone else is taking care of

22 it.

23   Q.   Who is taking care of it?

24   A.   It would be Paul Bjekich.

25   Q.   Okay.

---

34

1      A.   And I don't really recall if it's being used
2  or if it had been used.
3      Q.   Are you an officer, director, shareholder of
4  that corporation?
5      A.   No, I don't believe so, but I'm not sure.
6      Q.   What about -- We discussed officers and
7  directors of Tezak Investment Corporation.  Who are
8  its shareholders?
9      A.   It would be Quentin Tezak, Betty Tezak, Mark
10 Tezak, and Tiffany Tezak.
11     Q.   What about Tiffmark Network, Inc.?  We
12 discussed its officers and directors, but who are its
13 shareholders?
14     A.   It would be the same.
15     Q.   And how about for Tiffmark Vending?
16     A.   I can't be sure of that because it's not
17 even an operating company.
18     Q.   Are there any loans that Tezak Investment
19 Corporation has made to you?
20     A.   You know, it's possible, but it's been some
21 time if it was.  I'd have to check to be sure.
22     Q.   Would those be memorialized by any sort of
23 agreement or promissory note?
24     A.   Again, I don't recall.  I'd have to check.
25 I would think so, but I'm not sure.

35

1      Q.   Who would know or have those records?
2      A.   I'd have to check the check registers or
3  with Tiffany to find out if there is such a thing.
4      Q.   How about Tiffmark Network, Inc., has that
5  corporation made any loans to you?
6      A.   I don't believe so, but it's possible.
7      Q.   And again, would that be memorialized by any
8  agreement or promissory note?
9      A.   I don't believe so.  I'm not really sure.
10     Q.   If you don't know, who would know that
11 information?
12     A.   I would have to get it from the accountants
13 or from Tiffany.
14     Q.   When you say the "accountants," to whom are
15 you referring?
16     A.   It would be James Halstead & Associates.
17     Q.   Where is James Halstead & Associates
18 located?
19     A.   In Joliet, Illinois.
20     Q.   Is there a particular address in Joliet?
21     A.   On Plainfield Road.  I'm not sure of the
22 address.
23     Q.   Is James Halstead & Associates the
24 accountant for you personally?
25     A.   Yes.

36

1      Q.   Is it also the accountant for Tezak
2  Investment Corporation?
3      A.   Yes.
4      Q.   And is it also the accountant for Tiffmark
5  Network, Inc.?
6      A.   Yes.
7      Q.   How about for Tiffmark Vending, Inc.?
8      A.   I'm not sure because I just don't think that
9  was ever an operating company.  It was formed and I
10 don't believe ever used.
11     Q.   What about Alstec, Inc., is James Halstead &
12 Associates the accountant for that corporate entity?
13     A.   No, not -- I don't know who is.
14     Q.   What is Grely, Inc., G-R-E-L-Y?
15     A.   That was another corporation formed for real
16 estate purposes by Paul Bjekich.  I don't know who
17 the officers are.  I don't even believe it's
18 operating.
19     Q.   What is your role in Grely, Inc.?
20     A.   I have none.  I don't even know that I'm on
21 it or an officer or anything like that.
22     Q.   What about Land Deal, Inc.?
23     A.   That would be the same, same as -- all three
24 of those are the same.
25     Q.   When you say "all three," to which ones are

37

1  you referring?
2      A.   Grely, Alstec, and Land Deal.  I don't
3  believe Land Deal was even ever used.
4      Q.   So if I understand you correctly, all three
5  of those corporations would have been formed to
6  pursue real estate ventures; is that correct?
7      A.   That is correct.  One may be operating, but
8  I'm not sure.  I don't have the details on that.
9      Q.   Who would have or know that information?
10     A.   Paul Bjekich.
11     Q.   And what about Riverview Condo, LLC?
12     A.   That's a condominium developer who is not
13 us, but we own a portion of the development of
14 Riverview.  They have two condo developments.
15     Q.   When you say it's not "us," but "we" own a
16 portion --
17     A.   The corporation is not us.  I don't believe
18 it was formed by us.  We own some percentage of both
19 the developments that Riverview is developing.
20     Q.   And when you say "us" and "we" in reference
21 to Riverview --
22     A.   We I say that, I reference Tezak Investment
23 Corporation.
24     Q.   Who are the members of Riverview Condo, LLC?
25     A.   I couldn't tell you.

38

1    Q.    Is Tezak Investment Corp. a member of the
2    LLC?
3    A.    I believe so.
4    Q.    Do you know who the other investors in that
5    entity are?
6    A.    I don't.
7    Q.    Who would know that information?
8    A.    Paul Bjekich.
9    Q.    And who is Paul Bjekich?
10   A.    He's an attorney.
11   Q.    Where is he located?
12   A.    Joliet, Illinois.
13   Q.    What is your relationship to Mr. Bjekich?
14   A.    A business associate.
15   Q.    Has he represented you in any personal
16   capacity?
17   A.    He may have from time to time.
18   Q.    And then what is his relationship to any of
19   these corporate entities we've discussed?
20   A.    None to Tezak Investment or Tiffmark.  He
21   has something to do with Alstec, Grely, and Land
22   Deal.  I'm not sure that he has anything to do with
23   any of the others outside of legal work.
24   Q.    What type of legal work?
25   A.    Whatever would be required:  document

39

1    filing, corporate filing.
2    Q.    Is Tezak Investment Corp. still in business?
3    A.    Yes.
4    Q.    Apart from the rental income that we've
5    discussed from 2 Biltmore Estates, Unit No. 103, and
6    8 Biltmore Estates, Unit No. 107, what other sources
7    of revenue or income does Tezak Investment Corp.
8    have?
9    A.    That would be about it.
10   Q.    Just rental income from those two
11   properties?
12   A.    Yes, and any sales of properties, which has
13   only been one, to my knowledge, which was some time
14   ago, several years ago.
15   Q.    So we've discussed the 2 Biltmore Estates,
16   Unit No. 103, 8 Biltmore Estates, Unit No. 107, as
17   real estate holdings of Tezak Investment Corp.; is
18   that correct?
19   A.    Correct.
20   Q.    And then you mentioned there is some
21   farmland that the corporation has an interest in?
22   A.    Yes, Eloy, Arizona.
23   Q.    Eloy, Arizona.  Could you describe what that
24   land is?
25   A.    There is a 120-acre piece, a 160-acre piece,

40

1    and a 140-acre piece.
2    Q.    Okay.  And what do you estimate the market
3    value of each of those parcels to be?
4    A.    I couldn't tell you.  They were purchased in
5    the neighborhood of a $20,000 price per acre.
6    Q.    When were they purchased?
7    A.    Several years ago, at least three or four
8    years ago, five years ago.
9    Q.    So somewhere three to five years ago there's
10   these three parcels --
11   A.    Yes.
12   Q.    -- that were purchased at --
13   A.    Yes.
14   Q.    -- approximately $20,000 per acre?
15   A.    Right.
16   Q.    And is there any mortgage or loan
17   outstanding on any of those parcels?
18   A.    Yes, on both the 120 piece and the
19   160 piece.
20   Q.    Who is the lender on those mortgages?
21   A.    On the 160 piece, I think it was First
22   National Bank of Grant Park.  I'm not sure on the
23   120 piece.  And the 140 is no lender; it's multiple
24   investors.
25   Q.    Who are the investors on the 140-acre parcel

41

1    of farmland in Eloy, Arizona?
2    A.    I'm not sure.  There's multiple investors.
3    Q.    Where would those records be?
4    A.    Paul Bjekich would have those.
5    Q.    Are any of these --
6    A.    One of those two companies, Grely or Alstec,
7    may be the owner of record.  I'm really not positive.
8    Q.    Are any of those three parcels of farmland
9    occupied?
10   A.    No, I don't believe so.
11   Q.    Are they vacant?
12   A.    Yes.  They're just farmland.
13   Q.    Is there anyone using them to grow any
14   crops?
15   A.    I think at least one of them, maybe the 140,
16   is.  I don't think the other two are.
17   Q.    So how does Tezak Investment Corp. support
18   the mortgage payments for those properties if there's
19   no income or revenue from them?
20   A.    We don't contribute any towards the
21   mortgage.  We -- To the best I can recall, we found
22   the pieces.  We did all the legwork on them in
23   putting them together.  We put them through the
24   zoning process and everything like that.  We took
25   care of all those kind of things, which was our

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

---

42

1  contribution, best I can recall.

2     Q.  So who is the obligor on the mortgages on

3  those properties?

4     A.  I don't believe there is any on the 140.

5  The 120, I think is Gary Perinar and Rich Kubinski

6  and Paul Bjekich. I'm not positive of those. And

7  then the 160 is Jack Riley and Paul Bjekich, I

8  believe.

9     Q.  Okay. So those individual names you've just

10  mentioned, are those the individuals that are

11  responsible to pay the mortgages on those properties?

12     A.  Yes. Yes. And we may be on one of them,

13  but I'm not sure. I'd have to check on that.

14        MR. RADAKOVICH: By "we," who do you mean?

15        THE WITNESS: The corporation, Tezak

16     Investment Corporation.

17  BY MS. CHILDS:

18     Q.  Apart from 2 Biltmore Estates, Unit 103,

19  8 Biltmore Estates, Unit 107, and these three parcels

20  of farmland in Eloy, Arizona, that we've discussed,

21  is there any other real property in which Tezak

22  Investment Corp. has any interest?

23     A.  We have an interest also in Unit 126 at the

24  Biltmore, 8 Biltmore Estates.

25     Q.  8 Biltmore Estates, Unit 126?

---

43

1     A.  Yes.

2     Q.  Can you describe that property for me?

3     A.  Another condominium in that same complex

4  that 107 is at.

5     Q.  What would its square footage, number of

6  bedrooms description be?

7     A.  I believe three bedroom, 2,500 square feet,

8  approximately.

9     Q.  Is 8 Biltmore, 107, currently occupied?

10     A.  It is not.

11     Q.  It is not?

12     A.  It is not at the time.

13     Q.  How long has it been vacant?

14     A.  Somebody just moved out of there I think on

15  the 13th, maybe.

16     Q.  And who was the prior tenant there?

17     A.  I don't remember. They were there for three

18  weeks. It's another unit that runs from a week to a

19  month to six months from time to time, multiple

20  tenants.

21     Q.  Would the rentals for that unit also be

22  handled by Vacation --

23     A.  No. The rental -- the initial rentals,

24  yeah, would come through Vacation -- VRBO or realtors

25  who would come to us with a client.

---

44

1     Q.  So to whom do the tenants or the renters for

2  those properties pay the rents?

3     A.  They pay the rent to Tezak Investment

4  Corporation.

5     Q.  And how do they do that?

6     A.  By check.

7     Q.  Who do they give the check to?

8     A.  They usually mail it in.

9     Q.  Is there any type of management company or

10  on-site property manager that would handle any of

11  that for the corporation?

12     A.  I don't understand.

13     Q.  Does Biltmore Estates, the complex itself,

14  have any sort of management company?

15     A.  I don't know if they do or not. They have

16  nothing to do with the units. It's their complex. I

17  do all the day-to-day work. I do all the work on the

18  condos. Whatever needs to be done, I do it.

19     Q.  And what about 8 Biltmore Estates, Unit 126,

20  is that unit currently occupied?

21     A.  No, it isn't.

22     Q.  And when was the last time there was a

23  renter or a tenant there?

24     A.  There was somebody there just up until the

25  past couple weeks.

---

45

1     Q.  Is that one also rented on a weekly/monthly

2  basis?

3     A.  Weekly/monthly basis, yes.

4     Q.  When was 8 Biltmore Estates, Unit 126,

5  purchased?

6     A.  I guess 2008.

7     Q.  What was the purchase price in 2008 for that

8  unit?

9     A.  I believe somewhere in the neighborhood of

10  1 million, 3.

11     Q.  How much was put down for that property?

12     A.  I don't remember. I don't know because it

13  wasn't handled by me. Actually, I think the -- the

14  down payment, actually, I think was $100,000.

15     Q.  When you say it wasn't handled by you, who

16  would have handled that?

17     A.  Paul Bjekich would have handled it.

18     Q.  Paul Bjekich?

19     A.  Right. And there's two other partners in

20  there, Terry D'Arcy and Buddy Matheson (phonetic)

21  Wendell Matheson.

22     Q.  So if it was bought at 1.3 and there was

23  100,000 put down, is there a mortgage on that

24  property?

25     A.  Yes.

---

46

1    Q.   How much is that mortgage?

2    A.   I can't be sure, but it's somewhere in the

3 neighborhood of 1.2.

4    Q.   Who is the lender on that mortgage?

5    A.   I don't know.

6    Q.   What's the monthly mortgage payment?

7    A.   I couldn't tell you.

8    Q.   Is Tezak Investment Corp. responsible to pay

9 that mortgage on a monthly basis?

10   A.   No, it isn't.

11   Q.   So are those individual investors you

12 mentioned --

13   A.   I believe that mortgage is in Wendell

14 Matheson's name. He's responsible for the mortgage.

15   Q.   What about 2 Biltmore Estates, Unit No. 205?

16   A.   I have no idea what that is.

17   Q.   Any interest in that property?

18   A.   We had deposits on several units there. I

19 don't believe that was one of them.

20        MS. CHILDS:  I'll have the court reporter

21   mark this one Exhibit 3.

22             (Tezak Deposition Exhibit No. 3

23             marked for identification.)

24 BY MS. CHILDS:

25   Q.   Mr. Tezak, do you recognize that document?

47

1    A.   Just vaguely. I'm not really sure what it

2 is.

3    Q.   Okay. What is your understanding of what it

4 is?

5    A.   I'm not sure.

6    Q.   This appears to be a lis pendens notice that

7 was recorded in Maricopa County, Arizona, regarding a

8 civil lawsuit with Robert Tezak, a single man, as the

9 plaintiff vs. GK Biltmore II, LLC, an Arizona Limited

10 Liability Company, et al., for a number of other

11 defendants. Are you a plaintiff in this lawsuit?

12   A.   This would be incorrect, number one, because

13 it wouldn't be me. It would be Tezak Investment

14 Corporation.

15   Q.   Have you or Tezak Investment Corporation

16 sued GK Biltmore II, LLC?

17   A.   Yes, to recover several deposits that we

18 have on units, this being one of them.

19   Q.   So is this the only unit that's in dispute,

20 or are there others?

21   A.   I believe in addition to this unit there's

22 two other units.

23   Q.   Okay. And so this one, the case number

24 appears to be CV 2009-001412. What's the status of

25 this litigation?

48

1    A.   I'm not sure. This law firm is no longer

2 handling it. Polsinelli Shughart is handling it.

3 I'm not really sure of the status.

4    Q.   Could you spell the name of the individual

5 responsible for this case now?

6    A.   The law firm?

7    Q.   Yes.

8    A.   Polsinelli Shughart, or Shughart.

9    Q.   So the Rose Law Group is no longer

10 representing you in this --

11   A.   This is correct.

12   Q.   -- suit?

13        How much deposit money is at issue in your

14 dispute with GK Biltmore II, LLC?

15   A.   Approximately, I believe, $800,000.

16   Q.   And where did that money come from?

17   A.   It came from a sale of -- a farmland sale.

18   Q.   And what farmland was sold to make $800,000

19 in deposits to GK Biltmore II, LLC?

20   A.   It was a piece of farmland in Eloy, Arizona,

21 early on, four or five years ago.

22   Q.   And who owned that farmland?

23   A.   Tezak Investment Corporation.

24   Q.   Were there any additional investors like you

25 have with the other parcels?

49

1    A.   Yeah, there was. There was Paul Bjekich and

2 I believe Gerald Papich (phonetic). There may have

3 been another one outside of that, but those two.

4    Q.   So could you describe for me the farmland in

5 Eloy, Wisconsin --

6        MR. RADAKOVICH:  Arizona.

7 BY MS. CHILDS:

8    Q.   I'm sorry. (Continuing) -- Arizona that was

9 sold, you said, four or five years ago? What was the

10 size or description of that parcel?

11   A.   Approximately 200-plus acres, 220 acres,

12 something like that, and I don't recall the details.

13   Q.   Do you remember what the purchase price per

14 acre for that parcel was at the time the corporation

15 acquired it?

16   A.   I believe it was somewhere around 10- or

17 12,000.

18   Q.   Do you recall what the price per acre was at

19 the time of sale?

20   A.   Somewhere in the 20s, 20 to 25 somewhere, I

21 believe.

22   Q.   Okay. And did all of the proceeds from the

23 sale of that Eloy, Arizona, farmland -- well, what

24 happened to the proceeds?

25   A.   They were split between the owners.

USA VS. TEZAK                     DEP OF:  ROBERT J. TEZAK, 1/19/11

---

50

1  Whatever obligations there were taken care of, and
2  the balance was split between the owners.
3      Q.   Was all of that money or a portion of that
4  money put down in this $800,000 to GK Biltmore II,
5  LLC?
6      A.   I don't remember which monies were what,
7  but, you know, a substantial portion, if not all, of
8  it was.
9      Q.   So apart from these properties in the
10 Biltmore Estates development, some farmland in Eloy,
11 Arizona, is there any other real property in which
12 Tezak Investment Corp. has any interest?
13     A.   Yes.  We have an interest in another
14 development in Crest Hill, Illinois, called Weber
15 Caton.
16     Q.   What is Weber Caton?
17     A.   Weber Caton is a 113-acre commercial
18 development or 103-acre commercial development.
19     Q.   And is that a -- Is it Weber Caton, LLC?
20     A.   I believe so.
21     Q.   Who are the members of that LLC?
22     A.   Tezak Investment Corp., John D'Arcy, Gary
23 Perinar, Rich Kubinski.  I think that's it, I'm not
24 sure.
25     Q.   And apart from Biltmore Estates, farmland in

---

51

1  Eloy, Arizona, and a -- you said it's a commercial
2  development in Crest Hill --
3      A.   Yes.
4      Q.   -- Illinois, any other real property in
5  which Tezak Investment Corp. has any interest?
6      A.   I'm don't recall any off the top of my head.
7      Q.   Okay.  As far as the property in Crest Hill,
8  when was that purchased?
9      A.   Crest Hill would have been somewhere in
10 2005.
11     Q.   And what was the purchase price?
12     A.   I don't remember.
13     Q.   How much was put down at that time?
14     A.   I don't remember that either.
15     Q.   Is there a mortgage on the property?
16     A.   I believe there is with Standard Bank.
17     Q.   Standard Bank would be the mortgage lender?
18     A.   Yes.
19     Q.   What is the monthly mortgage payment?
20     A.   I don't know.
21     Q.   Who is responsible for the monthly mortgage
22 payment?
23     A.   I don't recall who's handling the corporate
24 stuff for that company.  Paul Bjekich is the
25 attorney, but I'm not sure beyond that.

---

52

1      Q.   Does Tezak Investment Corp. contribute to
2  the monthly mortgage expenditures for the Crest Hill
3  property?
4      A.   No, it does not.
5      Q.   Any other real estate that we've not already
6  discussed that Tezak Investment Corp. has any
7  interest in?
8      A.   I believe there's some lots in Joliet, maybe
9  five or six residential lots in Joliet on the east
10 side of town, but I don't remember which ones
11 exactly.
12     Q.   Okay.  Are those lots -- When were those
13 lots acquired?
14     A.   Again, several years ago, like maybe 2003,
15 2004.
16     Q.   And about how much money are we talking
17 those lots were purchased for?
18     A.   Oh, maybe 10-, $15,000 for all of them.
19     Q.   10- to 15,000 for all five lots?
20     A.   Yes.
21     Q.   What was the source of money to purchase
22 those?
23     A.   Corporation, corporate money.  The
24 corporation has been funded by my parents through
25 their funds from Day One.

---

53

1      Q.   Okay.  Is there any mortgage on those lots,
2  or are they owned outright?
3      A.   They're owned outright.
4      Q.   And what are the plans for those lots?
5      A.   To sell them at some point when we have a
6  recovery in the economy.
7      Q.   What is 1 Uno Circle?
8      A.   That was a former business building that
9  housed International Games.
10     Q.   Where is that located?
11     A.   1 Uno Circle.
12     Q.   In --
13     A.   Joliet, Illinois.
14     Q.   -- Joliet?  So is that a commercial
15 property, residential property?  How would you
16 describe it?
17     A.   It was a commercial building.
18     Q.   What has happened to it?
19     A.   That building was sold with the business in
20 1992.
21     Q.   So who purchased the building at 1 Uno
22 Circle?
23     A.   Mattel.
24     Q.   So Mattel purchased the real estate at that
25 location in addition to whatever --

---

USA VS. TEZAK      DEP OF: ROBERT J. TEZAK, 1/19/11

---

54

1    A.   The corporate International Games.

2    Q.   -- game and rights for the card game Uno?

3    A.   That's correct.

4    Q.   How much did you receive from Mattel as part

5 of that transaction?

6    A.   How much did I receive?

7    Q.   Well, let's start with you personally, yes.

8    A.   I'd have to check. I don't recall.

9 Millions of dollars.

10    Q.   And how much would -- Well, who else would

11 have received proceeds from that transaction?

12    A.   The other shareholders of International

13 Games.

14    Q.   Who were the shareholders of International

15 Games?

16    A.   Multiple shareholders: Joseph Cusimano,

17 Quentin and Betty Tezak. There was multiple owners,

18 I can't recall.

19    Q.   Were they equal shareholders or --

20    A.   No.

21    Q.   -- certain percentages or tiers of

22 shareholders?

23    A.   Percentages were different on just about

24 everybody.

25    Q.   And do you continue to receive any royalties

---

55

1 or stream of income from Mattel as a result of the

2 sale of the Uno card game?

3    A.   No.

4    Q.   What about any stock in Mattel or --

5    A.   I have none.

6    Q.   How about any of the various corporate

7 entities we've discussed today, do they have any

8 interest in royalties, any stream of income, any

9 stock as a result of that deal with Mattel?

10    A.   No.

11    Q.   What type of funds or deposits would be

12 going into the Tezak Investment Corporation account

13 at Chase?

14    A.   I don't understand.

15    Q.   Well, what monies would be deposited into

16 the corporation's bank account at Chase?

17    A.   Rents from any of the properties and funding

18 by my parents.

19    Q.   What is GK Realty Services?

20    A.   It's one of GK Biltmore's corporate

21 companies that at one time leased Unit 103, which is

22 another reason they're in the lawsuit because they

23 didn't fulfill the lease and pay all the rent and

24 left the property damaged.

25    Q.   So at some point in time there would have

---

56

1 been rent or lease payments from GK Realty Services

2 deposited into the Tezak Investment Corp. account?

3    A.   Yes, for approximately -- they had an

4 18-month lease, and they paid for about 14 months.

5    Q.   And who represents you in that litigation?

6 Is it the same --

7    A.   Polsinelli.

8    Q.   -- Polsinelli law firm?

9    A.   Yes.

10    Q.   What is Biltmore Lifestyles Real Estate

11 Company?

12    A.   That -- Nothing to do with us. It would be

13 a real estate agent that brought us a tenant.

14    Q.   Okay.

15    A.   They handle real estate at the Biltmore,

16 which has absolutely nothing to do with us. They

17 have tenants, and I think they may have brought us a

18 tenant or two for one of the units.

19    Q.   So why would money from Biltmore Lifestyles

20 Real Estate Company be deposited into the Tezak

21 Investment Corp. account?

22    A.   Probably from rentals.

23    Q.   You mentioned that Tezak Investment Corp.

24 has been funded primarily by your parents?

25    A.   That's correct. They've loaned the money to

---

57

1 the company on an ongoing basis.

2    Q.   And how much money are we talking about?

3    A.   7-, $800,000.

4    Q.   And you say they made these loans to the

5 company on an ongoing basis. In any particular

6 amounts or with what kind of frequency?

7    A.   What it took, when it took it to meet our

8 obligations in mortgage payments and so on and so

9 forth.

10    Q.   So if Tezak Investment Corp. needed money,

11 how would it get that money from your parents?

12    A.   We would ask for it, and then it would be

13 transferred from one of their accounts.

14    Q.   When you say "they" would ask for it --

15    A.   We would ask for it.

16    Q.   Who's "we"?

17    A.   The corporation.

18    Q.   Who on behalf of the corporation is asking

19 your parents for money?

20    A.   It would be myself, Tiffany, whatever that

21 case may be.

22    Q.   Are there corporate resolutions or minutes

23 to reflect these loans?

24    A.   I believe there would be.

25    Q.   Who would maintain those books or records?

---

USA VS. TEZAK                    DEP OF:   ROBERT J. TEZAK, 1/19/11

---

58

1   A.   We would have them.
2   Q.   When you say "we" --
3   A.   The corporate office, Tiffany, Paul Bjekich.
4   Q.   Why would there be checks from Tezak
5  Investment Corp. paid to Robert J. Tezak?
6   A.   It would be for expenses.  I'm really not
7  sure.  I'd have to look at the register and see what
8  the checks were for.  Expenses, travel, various
9  trips.
10  Q.   And if I recall your testimony correctly, it
11  would be just you and Tiffany that draw any salary
12  from Tezak Investment Corp., correct?
13  A.   Mark at one time.
14  Q.   What about Betty or Quentin, why would there
15  be payments from Tezak Investment Corp. going to
16  either of them?
17  A.   It would just -- I don't really know.  I
18  would have to check on the register.
19  Q.   And how about -- Sandra Tezak, you said is
20  your ex-wife?
21  A.   Yes.
22  Q.   Why would money be going from Tezak
23  Investment Corp. to Sandra?
24  A.   I don't know.  I would have to check on the
25  registers.

---

59

1   Q.   Who keeps the check registers for Tezak
2  Investment Corp.?
3   A.   They're in our office.
4   Q.   Is that something you handle in your role as
5  president?
6   A.   Myself or Tiffany and/or both of us.
7       MS. CHILDS:  Let's mark this Exhibit No. 4.
8            (Tezak Deposition Exhibit No. 4
9                 marked for identification.)
10  BY MS. CHILDS:
11  Q.   Mr. Tezak, I'm showing you what's been
12  marked Exhibit No. 4.  It's actually three pages of
13  three separate checks.  Do you recognize the first
14  one?
15  A.   Yes.
16  Q.   What is this?
17  A.   This would have been for our interest in --
18  or portion of our interest in the Eloy 120.
19       MR. RADAKOVICH:  Check No. 1633.
20  BY THE WITNESS:
21  A.   I'm not exactly sure, but I believe that's
22  what it is.
23  BY MS. CHILDS:
24  Q.   So just for purposes of identification in
25  the record, this is a check drawn on the Tezak

---

60

1  Investment Corp. account at Chase Bank?
2   A.   Yes.
3   Q.   Dated November 16th, 2007, payable to Paul
4  Bjekich in the amount of $20,000?
5   A.   Correct.
6   Q.   And what did you say this was for?
7   A.   I believe our interest in the land, the
8  120 acres in Eloy, I think.
9   Q.   Why would the corporation be paying Paul
10  Bjekich $20,000 in relation to its interest in
11  120 acres of land in Eloy, Arizona?
12  A.   It would be our portion, I guess, of what
13  was owed or what the down payment was.  I don't
14  really recall.
15  Q.   Would there be a corporate resolution or
16  some sort of minutes that would reflect this
17  transaction --
18  A.   I would think so.
19  Q.   -- in the corporate books and records?
20  A.   Yes.
21  Q.   Who else would have information regarding
22  this transaction?
23  A.   Paul Bjekich.
24  Q.   Let's turn to the next page of Exhibit
25  No. 4.  Do you recognize this document?

---

61

1       MR. RADAKOVICH:  Check No. 1985.
2       MS. CHILDS:  Yes.  For the record, this is a
3       check from the Tezak Investment Corp. account at
4       Chase Bank dated November 15th, 2008, payable to
5       Paul Bjekich in the amount of $16,000.
6  BY MS. CHILDS:
7   Q.   What was this check for?
8   A.   You know, I really don't recall what this
9  was for.  Some kind of stock, which had to be -- it
10  had to be for one of the -- like Grely or maybe one
11  of them that -- or involved in that condo investment
12  that the company has.  I'm not really sure.  It says
13  something about stock here.  I can't read this.
14  Q.   Is this your handwriting?  Did you make out
15  this check?
16  A.   Yes.
17  Q.   Is that your signature on this check?
18  A.   Yes.
19  Q.   Turning back just to the first one, is that
20  also your handwriting and your signature?
21  A.   This would be Mark Tezak.
22  Q.   So Mark Tezak wrote the first check for
23  20,000 to Paul Bjekich?
24  A.   Yes.
25  Q.   And the second one --

---

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

---

62

1    A.   I think.
2    Q.   -- is your handwriting, your signature?
3    A.   Yes.
4    Q.   But you're not sure what this $16,000 was
5  for?
6    A.   No, because I can't read what it says on the
7  bottom here.
8    Q.   Would there be a corporate resolution or
9  minutes in the books to reflect this transaction?
10   A.   Yes.
11   Q.   Who would maintain those books or records?
12   A.   They would be in our office.
13   Q.   Who else would have any information about
14 why these funds were paid to Mr. Bjekich.
15   A.   Paul Bjekich would have been acting as the
16 attorney, most likely.
17   Q.   So the third page of Exhibit No. 4, just for
18 identification purposes, is a check from the account
19 of Paul R. Bjekich, attorney at law, from Harris Bank
20 written, it looks like, May 23rd of 2007 and payable
21 to Robert J. Tezak, Tezak Investment Corp., in the
22 amount of $5,000?
23   A.   Yes.
24   Q.   What was this payment for?
25   A.   I couldn't tell you.

---

63

1    Q.   Why would Paul Bjekich be making payments to
2  Tezak Investment Corp.?
3    A.   It could have been a refund or an
4  overpayment.  It could have been a number of things.
5    Q.   Would there be a corporate resolution or
6  minutes in the corporate --
7    A.   I would think so.
8    Q.   -- books to describe that transaction?
9    A.   I would think so.  There would be some
10 payment somewhere that would reflect it.
11   Q.   And who else would have information about
12 this transaction?
13   A.   Paul Bjekich.
14        MR. RADAKOVICH:  I would just note,
15       Ms. Child, that the third check, 3651, from
16       Paul R. Bjekich, attorney at law, appears to be
17       from a trust account, a client fund.  It doesn't
18       say client fund trust, but a trust account.
19 BY MS. CHILDS:
20   Q.   Okay.  Mr. Tezak, why would Tezak Investment
21 Corp. be making checks payable to the Will County
22 Treasurer?
23   A.   Taxes.
24   Q.   And those would be taxes for what property?
25   A.   Those five lots that I described to you.

---

64

1    Q.   Okay.  And who is the owner of those lots?
2    A.   Tezak Investment Corporation.
3    Q.   Are they held in any sort of land trust?
4    A.   I believe so at First Midwest Bank.
5    Q.   Is First Midwest Bank the only bank in which
6  Tezak Investment Corp. holds any property through a
7  land trust?
8    A.   To the best of my knowledge, yes.
9    Q.   And so these are residential lots, you
10 indicated, in Joliet?
11   A.   Yes.
12   Q.   Are some of them in Lockport as well?
13   A.   It could be Lockport Township,
14 unincorporated area.
15   Q.   And from where does the corporation get the
16 money to pay the property taxes on those lots?
17   A.   The operations.
18   Q.   Excuse me?
19   A.   Continuing operations.
20   Q.   What is Kazette Corp.?
21   A.   That is a corporation I don't have anything
22 to do with.
23   Q.   Why would Kazette Corp. be making a check
24 payable to Tezak Investment?
25   A.   It could be for expenses or something

---

65

1  related to something we had done with them.  I'd have
2  to check that out.  I'm not really sure.
3    Q.   What business is Kazette Corp.?
4    A.   Some type of real estate holdings.  I'm
5  really not sure because I'm not involved in the
6  company.
7    Q.   Who is involved in Kazette Corp.?
8    A.   Other family members, Tezak family members.
9    Q.   Which ones?
10   A.   I couldn't tell you.  A group.
11   Q.   The address on your driver's license is
12 1211 Plainfield Road in Joliet, correct?
13   A.   Mm-hmm.
14   Q.   I have here as well an address for Kazette
15 Corp. at 1211 Plainfield Road in Joliet.  What type
16 of property is at that address?
17   A.   That would be the Tezak Funeral Home.
18   Q.   And apart from the Tezak Funeral Home, are
19 there any other businesses that operate from that
20 address?
21   A.   I believe there is probably several; but I'm
22 not a part of it, so I don't know.
23   Q.   We previously discussed Mark Renfro as an
24 investor that has a 25 percent interest in --
25   A.   Yes.

---

USA VS. TEZAK        DEP OF: ROBERT J. TEZAK, 1/19/11

66

1    Q.    -- the Biltmore, 2 Biltmore Estate, Unit

2 No. 103?

3    A.    That's correct.

4    Q.    Who is Mark Renfro?

5    A.    Again, he's a surgeon, a doctor, from

6 Dallas, Texas, I believe.

7    Q.    And how do you know him?

8    A.    I met him through mutual friends. He was

9 attracted to the Biltmore property and development

10 and came to me about investing in a unit.

11    Q.    And is Mr. Renfro an investor only in that

12 unit, or is he an investor in any of the

13 corporation's other properties?

14    A.    To the best of my knowledge -- In our

15 properties, that's the only property he's invested

16 in. I don't know if he's invested in any of the

17 others or not.

18    Q.    Why would Tezak Investment Corp. be making

19 checks payable to Mr. Renfro?

20    A.    Well, because when we bought the property,

21 it was leased by GK Biltmore, an 18-month lease, and

22 that was his 25 percent portion of the rental.

23    Q.    So 25 percent of the rental income from that

24 would flow directly from Tezak Investment Corp. to

25 Mr. Renfro?

67

1    A.    That's correct.

2    Q.    And the other 75 percent --

3    A.    Remained with Tezak Investment Corp.

4    Q.    What did he pay Tezak Investment Corp. for

5 his 25 percent share in that property?

6    A.    $600,000.

7    Q.    And that's what was used for the down

8 payment?

9    A.    That's correct.

10    Q.    Do you recall where that money came from?

11    A.    His money? You'd have to ask him. I don't

12 know where his money comes from.

13    Q.    You don't recall, like, a particular bank or

14 financial institution or --

15    A.    Oh, God, no. No, I don't.

16    Q.    -- a wire transfer or anything?

17    A.    It would have been a wire transfer, but I

18 don't remember what his bank was or whether it was a

19 personal account or not. I don't remember.

20    Q.    So would that $600,000 contributed by Mark

21 Renfro have been paid directly at the time of closing

22 on that property, or is it money that he gave to the

23 corporation and then the corporation used to buy the

24 property?

25    A.    You know, I don't know how the mechanics of

68

1 that was. I know we were under some kind of time

2 constraints. And how it exactly flowed through, I

3 don't remember. I'd have to check.

4    Q.    So you're not sure if that's money he

5 actually brought to closing for that property?

6    A.    It's definitely money he paid for 25 percent

7 of the property, and it was definitely money used for

8 the down payment. How it actually got there, I'm not

9 sure.

10    Q.    That's what I'm trying to understand.

11    A.    I believe it was by wires, but I'm not

12 positive on how the mechanics of that was.

13    Q.    What about -- Did any of the money for the

14 down payment on 2 Biltmore Estates, No. 103, come

15 from your parents trust account at Edward Jones?

16    A.    It could have. It's possible. I don't

17 remember. There were some mechanics to the whole

18 process, and I don't remember what it was. It was

19 quite complicated. It could have flowed through my

20 parents' trust accounts or out of my parents' trust

21 accounts and then back in to them from them. I don't

22 remember. There was some hitch or some mechanics to

23 it that I don't really recall what it was.

24    Q.    Why would it occur that way? Why the

25 complexity?

69

1    A.    I don't know. I'd have to review it and

2 find out exactly what happened.

3    Q.    Would Mr. Renfro's $600,000 have gone to

4 your parents' trust account and then from your

5 parents trust account to this property?

6    A.    It's possible. I'm not really sure how it

7 flowed, though. This was, what, 2007, I believe.

8    Q.    Who would -- If you don't know that, who

9 would know that?

10    A.    Well, I would know it by checking the books

11 and records and talking with whoever handled it,

12 whether it had been Paul Bjekich or whoever was

13 handling it at that time, Mark Renfro. That's how I

14 would find out.

15    Q.    So if the public records regarding this

16 sales transaction show that 600,000-dollar down

17 payment came from your trust account at Edward Jones,

18 is that the same 600,000 from Mr. Renfro or

19 different?

20    A.    If it did happen that way, it would probably

21 be the same. It flowed into their account for

22 whatever reason and then out of their account. I

23 don't know what the mechanics of it would have been

24 at the time.

25    Q.    Who would have conducted that transaction

70

1  for the corporation?
2      A.  It would have been myself; and if Tiffany
3  was involved, I'm really not sure.
4      Q.  Do you or Tiffany have power of attorney for
5  your parents' accounts?
6      A.  Well, no, we don't.  But they would have
7  been involved in any kind of process that was going
8  on themselves as well because they would have to sign
9  whatever documents had to be signed from Edward Jones
10 to make this process go on.
11     Q.  So do you or Tiffany have any signature
12 authority on your parents' trust account at Edward
13 Jones?
14     A.  No.
15     Q.  So if the corporation needs money from your
16 parents' trust accounts, it has to go to or through
17 your parents?
18     A.  It had to come from them.  It had to be
19 requested by us from them and from them to us.  We
20 have no authority to take anything out of any of
21 their accounts.
22     Q.  So we discussed previously your salary from
23 Tiffmark Network.  You indicated it was approximately
24 $900 a month?
25     A.  Yes.

71

1      Q.  But that went to fund your health insurance
2  at Blue Cross/Blue Shield?
3      A.  Life insurance, dental insurance.
4      Q.  Okay.  Any other expenses that that's used
5  to fund?
6          MR. RADAKOVICH:  I think it's Tezak
7      Investment Corp., not Tiffmark, $900 a month.  I
8      think you're inaccurate with your
9      characterization.  It was 200 a month from
10     Tiffmark, 900 a month from Tezak Investment
11     Corp.  900 a month including health insurance,
12     Blue Cross/Blue Shield; life insurance, New York
13     Life and Prudential.  900 a month Tezak
14     Investment, that's what he testified to earlier.
15 BY MS. CHILDS:
16     Q.  So would you have disclosed to probation
17 that you work for either or both of those entities?
18     A.  Both of them.
19     Q.  Tezak Investment Corp., you indicated, is
20 still in business.  What's the status of Tiffmark?
21     A.  Still in business.  It's not actively
22 pursued as far as new accounts, but they have a
23 number of accounts they've had for years that they
24 maintain.
25     Q.  What is the relationship between Tiffmark

72

1  Network and Tezak Investment Corp.?
2      A.  Outside of being similar shareholders,
3  sister companies I guess.
4      Q.  Do they do any business with each other?
5      A.  They may have from time to time for whatever
6  reason.  I don't really know, but it's possible.
7      Q.  So why might there be checks to and from
8  Tezak Investment Corp. and Tiffmark Network on the
9  same day?
10     A.  I don't know.  I would have to check and
11 find out what they were all for.
12     Q.  So what is your net monthly income that you
13 reported to probation?
14     A.  Just what I had told you, whatever the --
15 the insurances went up over the years, but basically
16 whatever it was for the insurance and the $200 from
17 Tiffmark.
18         MS. CHILDS:  I'll have the court reporter
19     make this one Exhibit No. 5.
20             (Tezak Deposition Exhibit No. 5
21              marked for identification.)
22 BY MS. CHILDS:
23     Q.  Mr. Tezak, do you recognize these documents?
24     A.  Yes.
25     Q.  And there are actually six checks here, each

73

1  of which is in the amount of $184.68?
2      A.  Correct.
3      Q.  Drawn on the account of Tiffmark Network,
4  Inc.?
5      A.  Correct.
6      Q.  Payable to Robert Tezak; is that correct?
7      A.  Yes.
8      Q.  And this is from the Tiffmark Network, Inc.,
9  account at Chase Bank?
10     A.  Yes.
11     Q.  Do you recognize the handwriting on the
12 first of those checks dated February 4, 2009?
13         MR. RADAKOVICH:  Printing or the signature?
14 BY MS. CHILDS:
15     Q.  Both.
16     A.  Printing could have been either mine or Mark
17 Tezak, who signed the check.
18     Q.  And how about the next one dated March 4th,
19 2009?
20     A.  Myself or Tiffany, and that would go for all
21 the rest of those.  Signatures are definitely
22 Tiffany.
23         MR. RADAKOVICH:  On which one, 1237?
24         THE WITNESS:  1237 on.
25         MR. RADAKOVICH:  1241?

74

```
1         THE WITNESS:  Yep.
2      MR. RADAKOVICH:  Yes?
3         THE WITNESS:  Yes.
4      MR. RADAKOVICH:  1245?
5         THE WITNESS:  Yes.
6      MR. RADAKOVICH:  1246?
7         THE WITNESS:  Yes.
8      MR. RADAKOVICH:  1248?
9         THE WITNESS:  Yes.
10     MR. RADAKOVICH:  All Tiffany's signature?
11        THE WITNESS:  Yes.  It would be Mark on the
12   first one.
13     MR. RADAKOVICH:  1234.
14 BY MS. CHILDS:
15     Q.   Are these checks representative of your
16 salary that you've disclosed to probation?
17     A.   Yes, less taxes.
18     Q.   So the net monthly amount is $184.68 per
19 month?
20     A.   Yes.
21     Q.   And is that your total net monthly income
22 from both Tezak Investment Corp. and Tiffmark
23 Network, Inc.?
24     A.   No.  It's from Tiffmark.
25     Q.   So how much, then, are you paid each month
```

75

```
1  from Tezak Investment Corp.?
2      A.   As I testified to earlier, the 900 dollars
3  some and some cents that covers all the insurance
4  expenditures, life insurance, dental.
5      Q.   Are those health insurance, life insurance,
6  dental paid from or by Tezak Investment Corp. or
7  Tiffmark Network?
8      A.   Tezak Investment Corp.
9      Q.   So do you get any check on a monthly basis
10 from Tezak Investment Corp.?
11     A.   No.  They're paid directly, those funds are
12 paid directly.  At one time I may have gotten a bonus
13 when things were rolling really well, but that was a
14 number of years ago.
15     Q.   Are any of these ATM or debit cards that we
16 discussed earlier from the accounts of Tiffmark
17 Network, Inc.?
18     A.   I don't think any of these are.  They do
19 exist, though.
20     Q.   And so what kind of deposits would be made
21 in the Tiffmark Network, Inc., account?
22     A.   That would be from the credit card
23 processing and the ATMs.
24     Q.   What funds would be disbursed from that
25 account?
```

76

```
1      A.   Whatever obligations that they have.
2      Q.   And what are the obligations of Tiffmark
3  Network, Inc.?
4      A.   There's very few related to them.  Whatever
5  is related to the day-to-day operations and this
6  salary, which reflects my salary.
7      Q.   Are you a signatory on the Tezak Investment
8  Corp. account?
9      A.   Yes.
10     Q.   Are you a signatory on the Tiffmark Network,
11 Inc., account?
12     A.   Yes.
13     Q.   Who else has signature authority on the
14 account of Tezak Investment Corp.?
15     A.   Mark, Tiffany, and Betty and Quentin, I
16 believe.
17     Q.   And who else has signature authority on the
18 Tiffmark Network, Inc., account?
19     A.   Mark, Tiffany, Quentin, and Betty.
20     Q.   Where are the books or check registers kept
21 for each of these accounts?
22     A.   They would be kept at the office.
23     Q.   Where is the office located?
24     A.   2340 South Standage.
25     Q.   And are they kept in paper ledger form, or
```

77

```
1  do you have some sort of computer accounting software
2  or spreadsheet?
3      A.   They would be kept in the checkbooks, and we
4  do some on-line banking with Chase that's handled by
5  Tiffany.
6      Q.   Do you have access to the on-line banking
7  for either Tezak Investment Corp. or Tiffmark --
8      A.   I do not.
9      Q.   -- Network?
10     A.   I should rephrase that.  I don't know if I
11 have access or not.  I may have access, but I don't
12 use it.
13        MS. CHILDS:  I'll have the court reporter
14     mark this one as Exhibit No. 6.
15             (Tezak Deposition Exhibit No. 6
16                  marked for identification.)
17 BY MS. CHILDS:
18     Q.   Do you recognize these two documents?
19     A.   As two checks, I do.
20     Q.   The first of those checks appears to be
21 drawn on the Tezak Investment Corp. account at Chase
22 Bank dated June 5th, 2008, Check No. 1881.  That's
23 payable to Tiffmark Network in the amount of $3,000;
24 is that correct?
25     A.   Correct.
```

78

1    Q.   Is this your handwriting and signature on
2  this check?
3    A.   Yes.
4    Q.   Why would Tezak Investment Corp. be paying
5  $3,000 to Tiffmark Network on June 5th, 2008?
6    A.   You know, I'm not really sure. I'd have to
7  check that out. Sometimes we'd lease an apartment or
8  condo units to re-lease, and we don't -- they are
9  competitors of ours that we don't really want them to
10  know it's Tezak Investment Corp., so we use Tiffmark
11  to accomplish that.
12    Q.   Turning to the second page --
13    A.   I'm not saying that's what happened here,
14  but sometimes that does happen on occasion.
15    Q.   I'm trying to understand why there's money
16  flowing between Tezak Investment Corp. --
17    A.   That would be the reason why.
18    Q.   -- and Tiffmark Network.
19    A.   Something like that. And there's been a
20  couple of times -- The checkbooks and the deposit
21  slips are very similar to the two. There has been a
22  couple of mistakes made where deposits went into
23  Tiffmark when they should not have; they should have
24  went into Tezak Investment Corp., and vice versa.
25    Q.   Who makes those deposits?

79

1    A.   I would, Mark would, Tiffany would.
2    Q.   If you look at the second page of Exhibit
3  No. 6, this is a check drawn on the Tiffmark Network,
4  Inc., account at Chase Bank dated June 5th, 2008, so
5  the same date as the previous check we just looked
6  at. This one is Check No. 1200?
7    MR. RADAKOVICH:   1220, I think -- I'm sorry.
8  My apologies. You're right.
9  BY MS. CHILDS:
10    Q.   Payable to the order of Tezak Investment
11  Corp. in the amount of $12,000; is that correct?
12    A.   Right.
13    Q.   Whose handwriting or signature is on this
14  check?
15    A.   Would have been Quentin's signature. It
16  appears to be my handwriting. I don't know the
17  reason of it. I'd have to check the register.
18    Q.   So why on the same day of June 5th, 2008, do
19  we have Tezak Investment Corp. paying $3,000 to
20  Tiffmark Network but Tiffmark Network paying $12,000
21  to Tezak Investment Corp.? I mean, what's --
22    A.   I'd have to check the register. It could
23  have been for a lease, a sublease, could have been a
24  mistaken deposit. I'm not really sure.
25    Q.   Would there be a corporate resolution or

80

1  minutes to reflect --
2    A.   I would believe so.
3    Q.   -- these transactions?
4    A.   I would believe so.
5    Q.   Who else would know or have information
6  about why this would occur?
7    A.   One of the other officers, check register.
8  Whatever it was, it is. I mean, the checks were
9  written, and they were written for a good reason,
10  business operations.
11    Q.   If you don't know what the reason is, how
12  can you say it was done for a good reason?
13    A.   Because it wouldn't be done for a bad
14  reason, that's why.
15    Q.   Did you bring with you today financial --
16  completed financial statements --
17    A.   Yes.
18    Q.   -- for Tezak Investment Corp. and Tiffmark
19  Network, Inc.?
20    A.   No, I did not. I am not a shareholder, and
21  I'm not at liability to give you any kind of
22  documents for Tezak Investment Corporation. I do not
23  own any of the Tezak Investment Corporation. I do
24  not own any of the Tiffmark Network, Incorporated.
25    Q.   And what about its corporate resolutions or

81

1  minute books, have you brought those with you today?
2    A.   No.
3    Q.   But you've testified here that there's
4  information contained in those records that would
5  explain numerous of these transactions; is that
6  correct?
7    A.   Check registers, yes. I would have to go
8  back to the check registers to get you the questions
9  that you asked, answered.
10    Q.   Apart from the check registers, are there
11  corporate resolutions or minute books to reflect
12  what's transpired?
13    A.   I would believe so, yes.
14    Q.   We're going to need those documents.
15    A.   Okay. Give us a list of what's needed.
16    Q.   Can you identify each and every bank or
17  financial institution where you maintain any account?
18    A.   Where I do?
19    Q.   Yes.
20    A.   First Midwest Bank.
21    Q.   What type of accounts do you have there?
22    A.   I have a checking account there, and that's
23  all I have.
24    Q.   What about a certificate of deposit?
25    A.   I have none.

USA VS. TEZAK      DEP OF: ROBERT J. TEZAK, 1/19/11

---

82

1      MS. CHILDS: I'll have the court reporter
2   mark this one Exhibit No. 7.
3      (Tezak Deposition Exhibit No. 7
4       marked for identification.)
5 BY MS. CHILDS:
6    Q.   Have you looked at Exhibit No. 7?
7    A.   Yes.
8    Q.   Do you recognize this document?
9    A.   I don't really recognize it. It's a
10 document of a certificate of deposit that's owned by
11 my mother and father that I happen to be on.
12    Q.   This appears to be a certificate of deposit
13 signature card from First Midwest Bank, where you
14 just disclosed you maintained only a checking
15 account; is that correct?
16    A.   I maintain. This is my parents', not mine.
17    Q.   Okay. And this account has the names of
18 Betty A. Tezak, Quentin R. Tezak, and Robert J.
19 Tezak; is that correct?
20    A.   That's correct.
21    Q.   And this certificate of deposit at one time
22 had $62,947.60; is that right?
23    A.   Mm-hmm.
24    Q.   And over time that's been withdrawn. So
25 what has happened to this money?

---

83

1    A.   Whatever's withdrawn has went into the Tezak
2 Investment Corp. as loans from them to the
3 corporation. This was not mine, never was mine, and
4 totally belongs to them.
5    Q.   So is there a reason why you would not have
6 disclosed this account and this source of funds to
7 probation?
8    A.   Well, it's not mine, is exactly why. It is
9 their account and their account only. For
10 convenience they put me on it, just like I have it on
11 their checking accounts, for convenience to pay their
12 bills and whatnot. It's not mine. I don't own it,
13 and it's not my money.
14    Q.   How many of your parents' accounts are you
15 on?
16    A.   I don't know. I really don't. Whatever
17 they would have put me on. I didn't even know I was
18 on this.
19    Q.   Do you have power of attorney for any of
20 your parents' property?
21    A.   No.
22    Q.   But you are on the signature cards for their
23 accounts?
24    A.   On this one, evidently.
25    Q.   You've also shown us these debit cards for

---

84

1 accounts in your parents' names?
2    A.   Yes.
3    Q.   So you have access to these funds?
4    A.   Access to them only if they give me access
5 and they tell me that they want money or they want me
6 to do something, and I use those cards to do it. I
7 normally usually don't have these cards with me. For
8 this trips and other trips or something like that, I
9 would have them with me.
10    Q.   Whose bank account is Chase checking account
11 No. 889825?
12    A.   I would have to look at it. I don't know.
13      MR. RADAKOVICH: I don't mean this to be
14 disrespectful, Ms. Childs. I don't even know my
15 own bank account numbers. I mean, I don't know
16 what they are.
17      Do you have a question pending?
18      MS. CHILDS: No. We can take a break if you
19 would like.
20      (A short break was had.)
21      MS. CHILDS: I'll have the court reporter
22 make this Exhibit No. 8.
23      (Tezak Deposition Exhibit No. 8
24       marked for identification.)
25

---

85

1 BY MS. CHILDS:
2    Q.   Mr. Tezak, do you recognize this document?
3    A.   Yes.
4    Q.   What is it?
5    A.   It's a loan from Robert and Merri Richards
6 to -- I know it has my name on it, but it's to the
7 Tezak Investment Corporation.
8    Q.   For identification purposes for the record,
9 this is a check from Robert Richards and Merri,
10 M-E-R-R-I, Richards drawn on the account of Fifth
11 Third Bank, Check No. 101, dated September 4, 2009,
12 payable to Robert J. Tezak in the amount of $25,000;
13 is that correct?
14    A.   Correct.
15    Q.   And what was this check for?
16    A.   It was a loan to Tezak Investment
17 Corporation.
18    Q.   For what purpose?
19    A.   Continuing operations.
20    Q.   And has that loan been repaid?
21    A.   Not as of yet, it hasn't.
22    Q.   Is there any sort of agreement or promissory
23 note to reflect that loan?
24    A.   I believe so, yes.
25    Q.   Where would that be located?

---

USA VS. TEZAK                          DEP OF:  ROBERT J. TEZAK, 1/19/11

86

1    A.   That would be in our offices.

2    Q.   Is there a corporate resolution or something

3  in the minute books of Tezak Investment Corp. to

4  reflect this transaction?

5    A.   I would believe so.

6    Q.   Why is this check made payable to you

7  individually, Robert J. Tezak?

8    A.   I don't know why they did it that way, but

9  it was deposited into the Tezak Investment

10  Corporation account because that's who it was to, or

11  supposed to be anyway.

12    Q.   Did you disclose receipt of this $25,000 to

13  your probation?

14    A.   No, because it was not to me.  It was to

15  Tezak Investment Corporation.  That's who the loan

16  was to; that's who's paying it back.

17    Q.   We'll also need whatever supporting

18  documentation the corporation has for that

19  transaction.

20    A.   Fine.

21    Q.   This is a loan just for continuing

22  operations?

23    A.   Yes.

24    Q.   For any particular real estate deal or

25  transaction?

87

1    A.   Continuing operations.

2       MS. CHILDS:  I'll have the court reporter

3    mark this one Exhibit No. 9.

4           (Tezak Deposition Exhibit No. 9

5                marked for identification.)

6  BY MS. CHILDS:

7    Q.   Mr. Tezak, do you recognize that document?

8    A.   It would have been a check from Terry D'Arcy

9  to me.  And it was not to me; again, this would have

10  been the Tezak Investment Corp.  I don't know why ...

11    Q.   For the record, this is a check drawn on the

12  account of D'Arcy, D, apostrophe, A-R-C-Y, account at

13  First Midwest Bank.  It's Check No. 120879 payable to

14  Bob Tezak, dated January 4th, 2007, in the amount of

15  $25,000?  What was the purpose of this check?

16    A.   I'm not sure.  I'd have to check.  It could

17  have been --

18       MR. RADAKOVICH:  25,500.

19       MS. CHILDS:  Sorry.  I'm reading it upside

20    down.

21  BY THE WITNESS:

22    A.   It could have been funds for Eloy purchases.

23  I don't really remember.  I'd have to check on that.

24  BY MS. CHILDS:

25    Q.   And this check is made payable to you

88

1  individually, Bob Tezak; is that correct?

2    A.   Correct, and it would have also been

3  deposited into Tezak Investment Corporation, who it's

4  actually to, or should have been to.

5    Q.   Did you disclose receipt of $25,500 from

6  D'Arcy to your probation?

7    A.   No, because I didn't receive it.  Tezak

8  Investment Corporation received it.

9    Q.   So why is the check made payable to you if

10  it's something for Tezak --

11    A.   Many people make that mistake, where they

12  would make it to me instead of the corporation.  It

13  happens -- not many, but it happens from time to

14  time.  This was one of those times.  But the paper

15  trail will show that it was deposited into Tezak

16  Investment Corporation.

17    Q.   What paper trail are you referring to?

18    A.   The checks, wherever the deposit went, will

19  be reflected in the records.

20    Q.   Is there an agreement or promissory note

21  regarding this transaction?

22    A.   That, I don't know because I don't know what

23  it was for.

24    Q.   Is there anything in the corporate

25  resolutions or minute books that would reflect this

89

1  transaction?

2    A.   Depending on what the transaction is, there

3  should be, there would be.

4    Q.   Who is Terry D'Arcy?

5    A.   Terry D'Arcy is a partner in one of the Eloy

6  pieces.  He's also a partner in one of the Biltmore

7  condos.

8    Q.   Which one?

9    A.   126.

10    Q.   And what is Mr. D'Arcy's business?

11    A.   He's in the car business.

12    Q.   The car business?

13    A.   Yes.

14    Q.   And so is this check from a car dealership?

15    A.   It looks like it.  I'm not really sure.  I

16  think.  If it's D'Arcy Motors, it is.

17    Q.   Have you ever purchased any vehicles from

18  that dealership?

19    A.   Have I?  No.

20    Q.   Has Tezak Investment purchased any vehicles

21  from that dealership?

22    A.   No.

23    Q.   So if Mr. D'Arcy told us that this check was

24  a refund for the deposit on the purchase of cars,

25  he's incorrect?

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

90

1      A.    That's a possibility.  I mean, it's a
2    possibility.  It wouldn't be from me.  It would have
3    been corporate, or it would have been my parents.
4    I'm not really sure.
5      Q.    What vehicles have your parents purchased
6    from D'Arcy?
7      A.    I don't know.  They've been friends --
8    family friends for years and years and years.  I
9    don't know exactly what that check is for, what it
10   was a result of.  I'd have to check on that.
11     Q.    Well, we've made the request for the
12   corporate resolution and minute books for Tezak
13   Investment Corp. and Tiffmark Network, Inc., so we'll
14   see if any of those are reflected there.
15     A.    Okay.
16           MS. CHILDS:  I'll have the court reporter
17   mark this one No. 10.
18               (Tezak Deposition Exhibit No. 10
19                 marked for identification.)
20   BY MS. CHILDS:
21     Q.    Mr. Tezak, do you recognize this document?
22     A.    Vaguely, I do.
23     Q.    This appears to be a check drawn on the
24   account of Betty Tezak and Robert Tezak at Chase?
25     A.    Yes.

91

1      Q.    Check No. 1166 dated February 27, 2008,
2    payable to Wells Fargo in the amount of $100,000; is
3    that correct?
4      A.    Yes.
5      Q.    And whose handwriting is on this check?
6      A.    This would be mine.
7      Q.    That's your handwriting?
8      A.    It appears to be mine, anyway, yeah.
9      Q.    Is that also your signature?
10     A.    Yes.
11     Q.    Why would you be paying $100,000 to Wells
12   Fargo?
13     A.    I'm not sure.  Obviously, it's some type of
14   payment for something.  I don't know exactly what.
15   There's a memo, but it's not -- I'd have to check and
16   see what that is.  It's not ringing a bell.  I'd have
17   to check and see exactly what it's for.  It was some
18   type of payment to Wells Fargo, and I couldn't tell
19   you why right now.
20     Q.    Well, $100,000 is a large payment; would you
21   agree?
22     A.    We make a lot of large payments for a lot of
23   real estate deals.
24     Q.    But no recollection of this one from
25   February 2008?

92

1      A.    No.
2      Q.    Would this -- This one is on a personal
3    checking account for Betty Tezak and Robert Tezak; is
4    it not?
5      A.    My father is also known as Robert, Quentin
6    and Robert.  I believe the three of us are on that
7    account:  Betty, Robert, and Quentin.
8      Q.    So would this pertain to Tezak Investment
9    Corp. business or some transaction with your parents?
10     A.    It would obviously probably pertain to Tezak
11   Investment Corp.  I mean, we're not in the habit of
12   paying Wells Fargo $100,000 at a crack unless it
13   refers to some kind of a business reason which
14   related to Tezak Investment Corporation.
15     Q.    So again, would there be a corporate
16   resolution --
17     A.    Oh, yes.
18     Q.    -- or minutes, something that would --
19     A.    There will be documents --
20     Q.    -- reflect --
21     A.    -- reflecting it.
22           MS. CHILDS:  I'll have the court reporter
23   mark this one No. 11.
24               (Tezak Deposition Exhibit No. 11
25                 marked for identification.)

93

1            MS. CHILDS:  For the record, Exhibit No. 11
2      is eight pages of checks or withdrawals.  We'll
3      review each individually in turn.
4    BY MS. CHILDS:
5      Q.    Mr. Tezak, you've had an opportunity to
6    review Exhibit No. 11.  Do you recognize each of the
7    pages in this exhibit?
8      A.    Yes.
9      Q.    Let's start with the first page, then, which
10   is a check drawn on the account of Betty Tezak and
11   Robert Tezak --
12     A.    Yes.
13     Q.    -- at Chase Bank, Check No. 1461, dated
14   May 6, 2009, payable to Chase or cash in the amount
15   of $200; is that correct?
16     A.    Yes.
17     Q.    Whose handwriting and signature appears on
18   this check?
19     A.    That would be mine.
20     Q.    Why would you be taking cash from the
21   account of Betty Tezak and Robert Tezak?
22     A.    Yes.  They authorized me to take this $200,
23   and it went for four money orders that went to the
24   government for these fines.
25     Q.    I previously had asked you about a Chase

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

94

1  checking account No. 889825 that you were not
2  familiar with --
3      A.  I said I'd have to look.
4      Q.  -- by account number.
5      A.  I said I'd have to look.  I don't memorize
6  account numbers.
7      Q.  If we look at this check here, in the center
8  of the check appear the account numbers 889825.  Does
9  that help you --
10     A.  I see it now.  I represented by this right
11 here, MO, money order.
12     Q.  And so that account number ending in 9825,
13 is that this account belonging to Betty Tezak and
14 Robert Tezak?
15     A.  And Quentin Tezak.  It doesn't belong to me.
16 It belongs to them.  It's their funds.  Every dime
17 that came into this account comes from them.
18     Q.  From what source?
19     A.  Wherever they want to put it from.  It's
20 their money.  They can do what they please with it.
21     Q.  So if there are numerous deposits into this
22 account from Edward Jones, what's the source of that
23 money?
24     A.  That would be their retirement funds at
25 Edward Jones.  Like I say, they can do what they

95

1  choose with their money.
2      Q.  I think you previously testified that the
3  check in Exhibit No. 9, the one from Robert and Merri
4  Richards --
5      A.  Yes.
6      Q.  Sorry, No. 8 was Robert and Merri Richards.
7  You thought that had been deposited where?
8      A.  I thought it was Tezak Investment Corp.  It
9  should have been, anyway.
10     Q.  Well, if that appears on the bank statements
11 as being deposited into this account 9825 for Betty
12 and Robert Tezak, why would that be?
13     A.  It would have had to somehow come back out
14 of there and back into the Tezak Investment Corp.
15 I'm not sure, I would have to check on that.
16     Q.  Who keeps the account records for this
17 account of Betty Tezak and Robert Tezak, account
18 ending in 9825?
19     A.  It would be my parents.
20     Q.  Do you have -- Well, you've signed this
21 check, so you have signatory authority, right?
22     A.  Yes.  I have access to it with their
23 approval.
24     Q.  Turning to the second page of Exhibit
25 No. 11, this appears to be a withdrawal slip for

96

1  Chase Bank seeking to withdraw money from that same
2  account ending in 9825.  This is for -- appears to be
3  dated June 25th, 2009, for Robert Tezak in the amount
4  of $1,000; is that correct?
5      A.  Yes.
6      Q.  And is that your signature here on this
7  withdrawal slip?
8      A.  Yes.
9      Q.  And why would you be taking $1,000 out of
10 the Betty Tezak and Robert Tezak account?
11     A.  I would have to check.  It appears that it
12 was prior to -- it was a late June withdrawal, which
13 would have been the time I was coming back for an
14 event in July.  It could have been pertaining to
15 that.
16     Q.  What event was that in July?
17     A.  The NASCAR race here at Chicagoland
18 Speedway.
19     Q.  What interest do you have in NASCAR racing?
20     A.  We do a large hospitality there for clients,
21 potential investors, investors.
22     Q.  When you say "we" do hospitality --
23     A.  Tezak Investment Corp.
24     Q.  Do you have any interest in any racing team
25 or car?

97

1      A.  No.
2      Q.  Have you ever?
3      A.  I have at one time.
4      Q.  How long ago was that?
5      A.  Prior to 1992.
6      Q.  And was that you individually or one of
7  these corporate entities?
8      A.  It was me individually through a corporate
9  entity called Uno Racing.
10     Q.  Let's turn to the third page of Exhibit
11 No. 11.  This one is a check drawn on the Betty Tezak
12 and Robert Tezak account at Chase, again account
13 number ending in 9825.  This one is Check No. 1139.
14 It looks like it's dated February 3rd, 2008.  This is
15 payable to Tickets Unlimited in the amount of $2,000;
16 is that correct?
17     A.  Yes.
18     Q.  And is this your signature on this check?
19     A.  Yes.
20     Q.  And why would you be making a $2,000
21 purchase to Tickets Unlimited from the Betty Tezak
22 and Robert Tezak account?
23     A.  Again, from time to time we entertain people
24 with dealers, sporting events, or any other thing
25 that we see fit to conduct our business.  This would

USA VS. TEZAK                    DEP OF:   ROBERT J. TEZAK, 1/19/11

98

1   be one of them.  I bought tickets here to the Super
2   Bowl for Mark Renfro, which he paid back on your very
3   next check.
4        Q.  Okay.  So let's look on the fourth page of
5   Exhibit No. 11.  Okay.  This is a check drawn on Mark
6   Renfro's account at Southside Bank, Check No. 2389,
7   dated February 3rd, 2008, in the amount of $2,000.
8   So explain to me again what the purpose or
9   relationship between these two payments is?
10       A.  This was to purchase tickets to the Super
11  Bowl.  This was the refund of the purchase of the
12  tickets.  I got them for Mark Renfro --
13            MR. RADAKOVICH:  By "refund," do you mean
14       reimbursement?
15            THE WITNESS:  Reimbursement, I mean.
16  BY THE WITNESS:
17       A.  -- who is an investor with us.
18  BY MS. CHILDS:
19       Q.  And Mark Renfro, again, is the 25 percent
20  investor in the Biltmore, Unit 103?
21       A.  This is correct.
22       Q.  Does he have any other investment interests
23  with you or any of the corporate entities with which
24  you're involved?
25       A.  He does not.

99

1        Q.  Did you attend the Super Bowl with him?
2        A.  Yes, I did.
3        Q.  Where was it located?
4        A.  Phoenix.
5        Q.  Okay.  Let's look at the fifth page of
6   Exhibit No. 11.  This is a check drawn on the account
7   of Betty Tezak and Robert Tezak, again from Chase
8   account ending 9825.  This is Check No. 1177, dated
9   March 12th, 2008.  This is payable to Sandra L. Tezak
10  in the amount of $600; is that correct?
11       A.  That's correct.
12       Q.  Is this your handwriting and signature on
13  this check?
14       A.  Yes.
15       Q.  And why would you be paying $600 to Sandra
16  Tezak?
17       A.  It says happy birthday there, so my parents
18  would have directed me to make her a check for this
19  amount for whatever their reason is.
20       Q.  And Sandra L. Tezak is your --
21       A.  Ex-wife.
22       Q.  -- ex-wife?
23       A.  And mother of my son.
24       Q.  And so why would you be writing a check from
25  the Betty and Robert Tezak account to Sandra?

100

1             MR. RADAKOVICH:  Asked and answered.
2        You can answer it again.
3   BY THE WITNESS:
4        A.  Because they would have directed me to do it
5   for whatever the reason that they wanted me to do it.
6   BY MS. CHILDS:
7        Q.  If your parents wished to make a gift to
8   Sandra, why wouldn't they have done so themselves?
9        A.  I don't know.  I pay all their bills.  I pay
10  most of their bills for them, and I do what they
11  direct me to do or ask me to do because that's a part
12  of what we do as a family.
13       Q.  Do you remain in contact with Sandra Tezak?
14       A.  Absolutely.  We're on very good terms.
15  She's the mother of my son and the grandson of my
16  parents.
17       Q.  Where does she live?
18       A.  She lives in Pinetop Arizona.
19       Q.  Pinetop?
20       A.  Yes.
21       Q.  P-I-N-E-T-O-P?
22       A.  Correct.
23       Q.  Where is that in relation to Phoenix?
24       A.  Three hours up into the mountains.
25            MR. RADAKOVICH:  I'm sorry.  Did you say

101

1        Pinetop, Arizona --
2             THE WITNESS:  Yes.
3             MR. RADAKOVICH:  -- or Arkansas?  Arizona.
4   BY MS. CHILDS:
5        Q.  When were you and Sandra divorced?
6        A.  1980.
7        Q.  And does she have any interests or role in
8   any of these corporate entities that we've discussed?
9        A.  She does not.
10       Q.  Turning to the sixth page of Exhibit No. 11.
11  This appears to be a check drawn on the account of
12  Robert F. Guyette, G-U-Y-E-T-T-E, M.D. of Scottsdale,
13  Arizona, on a Northern Trust Bank account, Check
14  No. 15300, dated May 24, 2008, payable to Robert
15  Tezak in the amount of $3,700; is that correct?
16       A.  Correct.
17       Q.  What is your understanding of what this
18  check is for?
19       A.  I don't remember.  It appears to be some
20  type of refund.  He did enormous dental work for me
21  that was paid for by my parents.
22       Q.  So Robert Guyette is your dentist?
23       A.  He is a dentist who did this particular
24  dental work.
25       Q.  And would that dental work have been covered

USA VS. TEZAK                          DEP OF:   ROBERT J. TEZAK, 1/19/11

---

102

1   by whatever insurance you get through Tezak
2   Investment Corp.?
3       A.   It wouldn't have been wholly covered, no.
4       Q.   So this refund is for procedures that you
5   had or received; is that correct?
6       A.   I believe so, yes.
7       Q.   So it does not pertain to any services
8   provided to either of your parents?
9       A.   I don't believe so.
10      Q.   The seventh page -- Oh, and what would you
11  have done with this check?
12      A.   You know, I would have to check.  It would
13  have been deposited back into their account if it was
14  for the dental work he did.  I mean, he did thousands
15  and thousands of dollars worth of dental work, so I'm
16  not really sure.
17      Q.   Let's look at the seventh page of Exhibit
18  No. 11.  This one is a check drawn on the account of
19  Betty Tezak and Robert Tezak at Chase, again the
20  account ending in 9825.  This one is Check No. 1265,
21  dated June 2, 2008, payable to cash in the amount of
22  $120.  Do you recognize this document?
23      A.   I don't really -- Yeah, I recognize it, but
24  I don't know what it's for.
25      Q.   Is that your handwriting and your signature

---

103

1   on the check?
2       A.   Yes.
3       Q.   Why would you be taking cash from the
4   account of Betty and Robert Tezak?
5       A.   I don't know, because they asked me to do it
6   for some particular reason or to pay for something.
7   I'm not really sure.  That, I'd have to check on the
8   register again.
9       Q.   Finally the last page of Exhibit No. 11.
10  This one is a check drawn on the account of Betty
11  Tezak and Robert Tezak at Chase, again account ending
12  9825.  This one is Check No. 1324, dated July 14,
13  2008, and this one is paid to the order of cash in
14  the amount of $3,000.  Do you recognize this one?
15      A.   I recognize it, obviously.  It was done by
16  me.
17      Q.   And is this your handwriting and your
18  signature on this check?
19      A.   Yeah.  It would have been at their
20  direction.  From time to time throughout the years,
21  they have sent me to get cash for them for whatever
22  reason:  they go to the casino, they gamble, so on
23  and so forth.  So they ask me to do it, I do it, and
24  bring them cash back.
25      Q.   Why would you have withdrawn $3,000 in --

---

104

1       A.   Because that's what they asked me to do.
2       Q.   -- July of 2008?
3       A.   Because that's what they asked me to do.
4   Again, their money, they can do what they please with
5   it.
6       Q.   So for each of these cash withdrawals or the
7   check from Renfro or the dentist that's payable to
8   you, did you disclose any of this --
9       A.   No, because it would not be --
10      Q.   -- income to probation?
11           MR. RADAKOVICH:  Wait for her to finish the
12      question.
13  BY MS. CHILDS:
14      Q.   Did you disclose receipt of any of these
15  funds to probation?
16      A.   Not unless they came to me personally, which
17  they did not.
18      Q.   These debit cards in your parents' name, you
19  said are for which bank?
20      A.   Bank of America.
21      Q.   Bank of America.  Do you have one of those
22  for any of their accounts at Chase?
23      A.   I may.  I may have.  Not with me, obviously.
24  It would be in the office, though, I would think.
25      Q.   And so you've testified that your parents

---

105

1   are in their late 80s and early 90s; is that right?
2       A.   Correct.
3       Q.   Do either of them drive?
4       A.   My father does.
5       Q.   Your father drives?
6       A.   Yes.
7       Q.   What does he drive?
8       A.   He drives a 2004 Buick.
9       Q.   How often do your parents get out and about?
10      A.   As often as it takes.  They go to the
11  dinner, they go to a casino, they go to church.
12      Q.   You've mentioned in reviewing some of these
13  checks to cash or cash withdrawals from their account
14  as being done at their direction, where you would
15  have gone to the bank for them?
16      A.   Correct.
17      Q.   Is there a reason why you're going to the
18  bank for them and they're not going for themselves?
19      A.   Just because they asked me to do it.
20           MS. CHILDS:  I'll have the court reporter
21      mark this one Group Exhibit 12.
22               (Tezak Deposition Exhibit No. 12.
23               marked for identification.)
24  BY MS. CHILDS:
25      Q.   Mr. Tezak, have you reviewed each of the tax

---

USA VS. TEZAK                    DEP OF:   ROBERT J. TEZAK, 1/19/11

---

106

1  returns in Group Exhibit No. 12?
2      A.   Yes.
3      Q.   Do you recognize those documents?
4      A.   Yes.
5      Q.   Are these tax returns that you produced to
6  probation for the years 2006, 2007, 2008?
7      A.   Yes, I believe so.
8      Q.   And on each of these returns it indicates
9  that your total W-2 wages for each of those years --
10 again, 2006, 2007, and 2008 -- were $7,200; is that
11 correct?
12     A.   Correct.
13     Q.   And on each of those years, 2,400 of those
14 dollars came from Tiffmark Network, Inc., and 4,800
15 of those dollars came from Tezak Investment; is that
16 correct?
17     A.   Yes.
18     Q.   As far as the taxable interest on these
19 returns, it indicates some interest income from
20 Prudential.  What account is that at Prudential?
21     A.   That would be a life insurance.
22     Q.   And I think you previously testified that's
23 some whole life insurance?
24     A.   Yes.
25     Q.   And remind me what the cash value of that

---

107

1  is.
2      A.   Minimal.
3      Q.   And what is your loan balance that you owe
4  to Prudential on the life insurance?
5      A.   8- or $9,000, $10,000, something like that.
6      Q.   What about -- Actually, in tax year 2007,
7  there's some interest reported from New York Life.
8  What account is that associated with?
9      A.   Another whole life policy.
10     Q.   Cash value to that one?
11     A.   I don't know, minimal.
12     Q.   Are there also loans against that life
13 insurance?
14     A.   Yes.
15     Q.   What's your loan balance owed to New York
16 Life?
17     A.   In the same category, 7-, 8-, $9,000.
18     Q.   But in each of those years your income
19 reported to the IRS was $7,200, correct?
20     A.   Correct.
21     Q.   Now, you've shown us today a bunch of credit
22 cards that were in your wallet.  Let's start with the
23 Legacy Visa account number ending in 9440.
24     A.   Yes.
25     Q.   This card's in the name of Robert J. Tezak.

---

108

1  What is your outstanding balance due on this card?
2      A.   I'm not really sure because there's a file
3  that I could not find that I'm going to have my
4  daughter find on Thursday when she comes in.  I think
5  $1,700, but I'm not positive.
6      Q.   What's your minimum monthly payment on this
7  card?
8      A.   It would be like $25.
9      Q.   Have you consistently made that payment?
10     A.   Yes.
11     Q.   Next we have a Platinum Mastercard account
12 number ending in 9897 in the name of Robert J. Tezak.
13 What's your balance on this account?
14     A.   $300, maybe.
15     Q.   And minimum payment on it?
16     A.   $10.
17     Q.   And have you made that consistently as well?
18     A.   Yes.
19     Q.   Which bank -- Is the Legacy Visa with Legacy
20 Bank?
21     A.   I believe so.
22     Q.   What about this Platinum Mastercard, to
23 which bank is that made payable?
24     A.   I'm not sure.  You know, I don't know if
25 it's to a bank.  I believe it's Card Services.

---

109

1      Q.   Next we have a Platinum Visa account ending
2  5844 in the name of Robert J. Tezak.  Which bank has
3  this account?
4      A.   These are the same banks, maybe Card
5  Services again.
6      Q.   What's the balance owed on this one?
7      A.   2- or $300.
8      Q.   And the minimum payment?
9      A.   $10.
10     Q.   Okay.  Next I have an Applied Bank Visa
11 account ending in 1836.  This one is in the name of
12 Robert J. Tezak.  Is this one payable to Applied
13 Bank?
14     A.   Yes.
15     Q.   What's the balance on it?
16     A.   I'm not really sure.  $1,500 or something
17 like that, I'm not really sure.
18     Q.   What's your minimum payment?
19     A.   $25, $50 maybe, which I think is pretty
20 high.  It would be somewhere around 20, $25.
21     Q.   Next we've got an American Express Platinum
22 Cash Rebate card.  This one is an account ending
23 43012, but this one is in the name of Quentin Tezak?
24     A.   Yes.
25     Q.   What's this account?

---

USA VS. TEZAK        DEP OF:   ROBERT J. TEZAK, 1/19/11

110

1    A.   This account is used for Costco, where we
2  buy many supplies for the units.
3    Q.   Is it only used for Costco?  Any other
4  purpose?
5    A.   Costco.  I mean, they may use it for other
6  purposes.  I don't.
7    Q.   Next we have a Credit One Bank Visa card
8  ending in 4602.  This one is in the name of Robert
9  Tezak.  Is this one payable to -- Which bank?
10   A.   It would be to Credit One.
11   Q.   What's the balance on this card?
12   A.   2-, $300.
13   Q.   And the minimum payment?
14   A.   10, $12.  These three cards are pretty much
15 the same.  They have very low limits, I think $500 on
16 each card.
17   Q.   What is your total -- I mean, how much are
18 you spending on credit cards on a monthly basis?
19   A.   Probably about a hundred dollars.
20   Q.   So do you have other credit cards that are
21 not here with you?
22   A.   You know, I think this is about it.  This is
23 about all I have.
24   Q.   What about a Capital One card in the name of
25 Bob Tezak for Tezak Florist?

111

1    A.   Oh, yeah.  That would be my card as well.  I
2  don't know where that card's at.
3    Q.   What about a First National Bank credit card
4  in the name of Robert Tezak?
5    A.   That may be one and the same as this.
6    Q.   This is account number ending 9940?
7    A.   Yeah, this is it.
8    Q.   So that's the one that says Legacy on the
9  front, but that's your First National Bank --
10   A.   Right.
11   Q.   -- Visa?
12   A.   Yes.
13   Q.   And then Applied Bank, do you have more than
14 one credit card with Applied Bank?
15   A.   No, I don't think so.
16   Q.   Any account for Robert J. Tezak ending in
17 2360?
18   A.   I'm not really sure.  There have been a
19 couple that have been closed.
20   Q.   What about Aspire Visa?  Did you have two
21 different credit cards with Aspire Visa?
22   A.   I believe Aspire is one of them that's
23 closed.  They're out of business or -- I don't know
24 what happened.
25   Q.   How about Merrick Bank?

112

1    A.   Merrick Bank is a valid one, and I don't
2  have the card with me for some reason.
3    Q.   And what would your balance on it be?
4    A.   It would be, I don't know, $1,500, something
5  like that, a thousand dollars.  I'm not really sure.
6    Q.   How about any credit cards in the name of
7  Robert J. Tezak with HSBC?
8    A.   That would be these two.
9    Q.   So that's these two you referred to --
10   A.   Right.
11   Q.   -- as being payable to Card Services?
12   A.   Yeah.  It wasn't Card Services.  It's HSBC.
13   Q.   So that's the Platinum Visa ending in
14 5844 --
15   A.   Correct.
16   Q.   -- and the Platinum Mastercard ending in
17 9897?
18   A.   Yes.
19   Q.   So if we go back to your tax returns for
20 2007 and 2008, those both indicate your total income
21 to be $7,200, correct?
22   A.   Correct.
23   Q.   So can you tell me how it is that you're
24 able to pay in 2007 $10,266.98 as a combined total of
25 your credit card payments in that year?

113

1    A.   It would depend on what it was that we were
2  paying.  Either I paid it or my parents paid it for
3  me.
4    Q.   And how about in 2008, again the total of
5  your credit card payments to these cards we've just
6  discussed in 2008 was $7,302.29, which again exceeds
7  your $7,200 income?
8    A.   Any difference of any bill I have, including
9  medical, is picked up by my parents.
10   Q.   Do you use any of your parents' credit
11 cards?  I see you've got a couple here --
12   A.   From time to time for trips --
13   Q.   -- from Betty and Quentin?
14   A.   -- or places I need to go for business or
15 whatever the case may be, yes, they give me the cards
16 and give me authority to use them.
17   Q.   How about their Capital One credit cards?
18 Do you have any Capital One credit cards for either
19 of them?
20   A.   They do have them, and I have used them from
21 time to time for various purposes and whatever they
22 ask me to do or whatever I'm doing.  But I don't have
23 them with me.  Not as a whole, I don't use them very
24 often.
25   Q.   Do you gamble, Mr. Tezak?

---

**114**

1   A.  I like to.

2   Q.  At what locations have you gambled while

3  you've been on probation?

4   A.  Harrah's in Joliet and the Arizona Indian

5  casinos, which I go to with my parents often.

6   Q.  Just Harrah's Joliet and any reservation in

7  Arizona?

8   A.  Yeah.  I believe somewhere several years

9  back I may have been in Vegas a couple of times,

10  either coming from Chicago or going to Chicago or for

11  some seminars or something like that.

12   Q.  Anywhere else?

13   A.  Not that I can remember.

14   Q.  What about Biloxi, Mississippi?

15   A.  Yes, that's true, Biloxi.

16   Q.  And what about New Orleans, Louisiana?

17   A.  Yes, went through there on the same trip.

18   Q.  When was that trip?

19   A.  That was a trip maybe two or three years ago

20  now.

21   Q.  And did you have approval from probation to

22  travel to Biloxi, Mississippi, and New Orleans,

23  Louisiana?

24   A.  Yeah, I believe so.  I was going to pick up

25  my daughter and drive her back from Florida.

---

**115**

1   Q.  And what about any of your visits to

2  Las Vegas, did you have permission from probation --

3   A.  Yes.  I usually reported everywhere I went.

4   Q.  -- to travel there?

5   A.  Yeah.

6   Q.  Did you report any of your gambling winnings

7  to your probation?

8   A.  I didn't have gambling winnings.

9   Q.  What do you mean when you say you didn't

10  have any gambling winnings?

11   A.  Well, my parents used to give me money to

12  gamble when I went back to Illinois religiously

13  because they love to gamble and play slot machines

14  and stuff, but it never resulted in net winnings.  It

15  always related in a net loss.

16   Q.  Have you received a W-2G form from the

17  casinos regarding any amounts that you won?

18   A.  Yeah, I would have.  But again, it's all

19  offset by the losses.

20   Q.  Okay.  Is there a reason that your W-2G

21  winnings are not reported on any tax returns?

22   A.  Well, I'm not sure about that.  Our

23  accountant has done all of the tax returns.  There

24  was a conversation about a number of times when they

25  would give me money when I went to Illinois to

---

**116**

1  gamble.  I was actually gambling for them.  And when

2  I had these winnings, which always ended up as net

3  losses, there was a debate on whether I should really

4  report that on my form.  Because although I was doing

5  the gambling, it was their -- I was doing it for them

6  with their money.  I always thought that I shouldn't

7  have to do that, but the accountant ended up thinking

8  that I should.  It was debated.  So he had two

9  returns prepared, one with the gambling winnings and

10  one without the gambling winnings, and I ended up

11  going with whatever suggestion they made.

12   Q.  Okay.  Which accountant is that?

13   A.  It's Halstead & Associates.

14   Q.  And James Halstead & Associates is the tax

15  preparer on each of the returns we've reviewed here

16  today?

17   A.  I believe so.

18   Q.  Did you ever direct Mr. Halstead not to

19  produce documents or comply with the subpoena we

20  issued in this case?

21   A.  I never have.  He's never asked me.

22   Q.  Do you know if anyone in your family would

23  have told him not to do so?

24   A.  That, I don't know.  He does my taxes.

25  That's his -- He's on there.  No, I wouldn't.  I

---

**117**

1  would tell him to produce whatever he has on my

2  behalf.

3         MS. CHILDS:  I'll mark this one Exhibit 13.

4         (Tezak Deposition Exhibit No. 13

5         marked for identification.)

6  BY MS. CHILDS:

7   Q.  Mr. Tezak, I don't anticipate that you've

8  seen this before, but I will represent to you that

9  these are documents we received from Harrah's Casino

10  in Joliet in response to a subpoena we issued to them

11  regarding your gambling activity there.  I just want

12  to quickly run through here regarding any W2-Gs that

13  would have been issued to you over the years?

14       The date of this report is from January of

15  2003 to December 31st of 2010.  So as we're looking

16  at the first page, which is page No. 1 here at the

17  top, it starts with the month of January of 2006.

18  Here it indicates, if you look about seven lines

19  down, there's an entry for totals of January 2006.

20   A.  Okay.

21   Q.  So that indicates there were three visits in

22  January of 2006 and gross winnings of $12,000; do you

23  see that?

24   A.  Mm-hmm.

25   Q.  Do you have any reason to doubt that you

---

118

1  were given a W-2G for $12,000 in January of 2006?
2     A.   No.  I mean, if it says it was, it was.
3  Again, I was gambling with my parents' money.
4     Q.   If we go down -- scroll down the next couple
5  of entries to where there's a -- kind of midway down
6  the page there's a total for February of 2006.
7     A.   Okay.
8     Q.   And that indicates two visits with total
9  winnings of $3,250; is that right?
10    A.   Mm-hmm.
11    Q.   Now let's go to -- Actually, it looks like
12 it goes on to the next page, page 2.  Towards the top
13 of the page there there's a total for March of 2006;
14 do you see that?
15    A.   Mm-hmm.
16    Q.   About seven visits with gross winnings of
17 $15,750; is that right?
18    A.   Where was that at?
19    Q.   It's, like, the second line -- second entry
20 on that page.  So seven visits, $15,750?
21    A.   Mm-hmm.
22    Q.   And if you'll keep scrolling through, it
23 looks like just one visit in April of 2006 with
24 winnings of $1,250.
25    A.   Okay.

119

1     Q.   And then if we go down about three-quarters
2  of the page, actually just a few lines up from the
3  bottom of that page, there's a total for May 2006.
4  That indicates about ten visits and gross winnings of
5  $31,150; is that right?
6     A.   Yes.
7     Q.   So if you'll turn to the next page,
8  page 3, towards the top of the page there's a total
9  for June of 2006.
10    A.   Mm-hmm.
11    Q.   And the number of visits is two with
12 winnings of $6,500; is that right?
13    A.   Where was that again?
14    Q.   It's the second entry on page No. 3.
15    A.   Okay.
16    Q.   Then if we scroll down to the total for July
17 of 2006, which is about in the middle of the page --
18    A.   Okay.
19    Q.   -- we've got six visits and gross winnings
20 of $14,000; do you see that?
21    A.   Yes.
22    Q.   Then just a few lines down from that, it
23 just shows in August 2006 you've got one visit with
24 winnings of $2,000; is that correct?
25    A.   Yes.

120

1     Q.   And then it looks like we've got to turn to
2  the next page, page No. 4.  About a third of the way
3  down it has the total for September 2006, and that
4  shows about nine visits with winnings of $29,000; do
5  you see that?
6     A.   Yes.
7     Q.   Then just a few lines down from that is a
8  total for October 2006.  You've got two visits with
9  another $3,500 in winnings; is that right?
10    A.   How much?
11    Q.   The total for October 2006, two visits,
12 $3,500.  It's about --
13    A.   Yes.
14    Q.   -- a little below the middle of the page.
15    A.   Yes.
16    Q.   And then if you'll go just a few lines below
17 that, there's a total for November of 2006.  There
18 we've got three visits with winnings of 4,500; is
19 that --
20    A.   Yes.
21    Q.   -- correct?
22         And if we turn to the next page, No. 5,
23 you've got a total for December 2006 on the second
24 line, and that shows two visits with winnings of
25 $2,750; do you see that?

121

1     A.   Yes.
2     Q.   Okay.  And then just below that lists your
3  grand total for the year of 2006.  You've got
4  48 visits with winnings of $125,650; do you see that?
5     A.   Mm-hmm.
6     Q.   Now we're just going to keep scrolling the
7  pages.  For 2007 it looks like there are no entries
8  for January, but it starts with February 2007.  And
9  in roughly the middle of page 5, in February it shows
10 four visits with winnings of $6,500; do you see that?
11    A.   Yes.
12    Q.   Then it looks like no activity for March or
13 April of that year.  But then if you go down a few
14 more lines, you'll see totals for May of 2007.
15 There's two visits with winnings of $7,000; do you
16 see that?
17    A.   Yes.
18    Q.   And then just another few lines below that,
19 for June 2007 you've got one visit with winnings of
20 $1,500; is that correct?
21    A.   Yes.
22    Q.   Then it looks like we have to turn the page
23 to page No. 6 to get the July total, and that appears
24 roughly in the middle of the page there.  It says
25 totals for July 2007.  You've got 12 visits and

USA VS. TEZAK        DEP OF: ROBERT J. TEZAK, 1/19/11

---

122

1  winnings of $41,500; do you see that?
2      A.   Yes.
3      Q.   And then it looks like we've got to turn the
4  page to page No. 7. About a third of the way down on
5  this page we have a total for August of 2007 showing
6  15 visits and winnings of $31,000; is that right?
7      A.   Yes.
8      Q.   We'll turn the page to page No. 8 for
9  September of that year. In the middle of that page
10 it shows totals for September 2007. We've got about
11 23 visits and gross winnings of $58,750; is that
12 correct?
13     A.   Yes.
14     Q.   And it looks like no activity in October
15 2007. The next total we've got is in November 2007,
16 two visits totaling winnings of $7,500; is that
17 right?
18     A.   Yes.
19     Q.   Then a few more lines below that in December
20 2007, we've got two visits and winnings of $2,750; do
21 you see that?
22     A.   Yes.
23     Q.   And just below that we have your grand total
24 for calendar year 2007, 61 visits and total winnings
25 of $156,500; is that correct?

---

123

1      A.   Yes.
2      Q.   Let's turn the page, then, to No. 9. It
3  looks like in early '08 there's no activity, really,
4  until July of 2008. So about halfway -- well, a
5  little more than halfway down page No. 9 it gives a
6  total for July 2008. We've got nine visits with
7  winnings of $30,000; do you see that?
8      A.   Yes.
9      Q.   Then no activity for August. But as we turn
10 the page to No. 10, about a little more than halfway
11 down the page is your total for September 2008, and
12 that shows 17 visits with gross winnings of $60,500;
13 do you see that?
14     Page 8?
15     Q.   I'm sorry. We're on page No. 10. Slightly
16 more than halfway down the page there's a total for
17 September 2008, and that shows 17 visits, $60,500.
18     A.   Yes.
19     Q.   Do you see that?
20     A.   Yes.
21     Q.   Okay. Then we've got no activity in October
22 or November of 2008. And it shows just a few lines
23 below September, you have a total for December 2008,
24 two visits and winnings of $6,250; do you see that?
25     A.   Yes.

---

124

1      Q.   And then just below that, we have your total
2  for calendar year 2008 of 28 visits and winnings of
3  $96,750; is that correct?
4      A.   Yes.
5      Q.   Then we get into 2009. There's really no
6  activity in the early part of the year. But we get
7  to July 2009, is that when your NASCAR trip was here?
8      A.   Yes, it was.
9      Q.   And so did you visit the casinos during that
10 trip?
11     A.   Yes.
12     Q.   So as you turn to the last page of this
13 No. 11, it shows your total winnings that time in
14 July of '09 was about four visits, $5,250 in
15 winnings; is that right?
16     A.   Yes.
17     Q.   So you'll see the last entry on this page
18 shows that for the time period of this report we've
19 got you visiting casinos 141 times and winning
20 $384,150; is that correct?
21     A.   If it's on there, it appears to be.
22     Q.   And so tell me again why those amount of
23 winnings would not have been reported as income on
24 your tax returns or disclosed to probation.
25     A.   Well, they weren't income on my tax returns.

---

125

1  They were all offset by more than that in losses. It
2  was money that my parents gave me to gamble for them.
3  That's exactly why.
4      Q.   If you won almost $385,000, how much did you
5  lose?
6      A.   Well, this is a very deceiving formula here.
7  This money is recirculated money. It gets
8  recirculated and recirculated and recirculated. So
9  is it really $385,000? No. It's recirculated money
10 that started out to be who knows what and multiplies
11 as you recirculate it. You win it and lose it, win
12 it and lose it.
13     Q.   If you're reporting to probation that you
14 make $185 a month, $7,200 a year, how do you have
15 this kind of money to gamble?
16     A.   I just got done saying that my parents gave
17 me the funds to gamble for them. I've always been
18 lucky at doing things like this, and they've given me
19 money, which is their prerogative. It's their money;
20 they can do whatever they please with it.
21     Q.   Would you have given your W-2Gs for your
22 winnings to your parents for them to --
23     A.   Well, if I had winnings that I brought back
24 with me, I would have given it to them.
25     Q.   On how many occasions did that occur?

---

126

1    A.   I don't know, whatever it says.  But like I
2  said, it never ended up a net profit.  It always
3  ended up net loss.
4    Q.   How would you give the money to your
5  parents?
6    A.   Just bring them whatever I had.
7    Q.   Would you give them cash?  Would you --
8    A.   Oh, yeah.
9    Q.   -- give them chips?  Would you write them a
10 check?
11   A.   I'd give it in cash.  Whatever the cash was,
12 I'd give it to them.
13   Q.   How much cash can you fit in your pocket?
14   A.   I don't know.  I wouldn't have put it in my
15 pocket.  I would have put it in an envelope or
16 something and put it in my briefcase.
17   Q.   What games do you play?
18   A.   Strictly slot machines.
19   Q.   Just slots?
20   A.   That's it.
21   Q.   No blackjack or roulette or poker?
22   A.   Rarely.  Rarely I would play blackjack.
23 Rarely.  They're slot players, and they're all into
24 slots.  That's what they want me to play, so that's
25 what I play.  Frankly, it's no choice.  You just put

127

1  the money in and hit the button.
2        MS. CHILDS:  I'll mark this one 14.
3            (Tezak Deposition Exhibit No. 14
4            marked for identification.)
5  BY MS. CHILDS:
6    Q.   Mr. Tezak, again, I wouldn't expect you to
7  see this before, but I will again represent to you
8  that this is a spreadsheet of slot play that we
9  received as records produced from Harrah's Casino.
10 It's just entries of your gambling.  Again, this is
11 just associated with different machines.  So I won't
12 belabor this line by line.  But again, if there are
13 winnings disclosed here, is there a reason why you
14 didn't report those to probation or the IRS?
15   A.   They weren't my winnings.  They were
16 reported to the IRS; if there's winnings not offset
17 by losses, which there never was, they would have
18 been reported.
19   Q.   And how do you know how much more you lost
20 versus what you won?
21   A.   I guess it's a statement that comes from the
22 casinos, from Harrah's, what would be reflected in
23 the tax returns, I think.
24   Q.   And so how often do you gamble?
25   A.   Just whenever I would be there for these

128

1  events.  Early on I was there more than I am now
2  because of Weber Caton being in full development.  So
3  I was there more often during periods of time years
4  ago than I am now.  Now I'm there maybe three times a
5  year, four max.
6    Q.   And the visits to casinos in Biloxi,
7  Mississippi, and New Orleans, Louisiana, you said
8  were approved or authorized by probation?
9    A.   You asked me about the trip.
10   Q.   I'm sorry.  You had permission to travel?
11   A.   As far as I know, I did.
12   Q.   That was in March of 2009?
13   A.   Yeah.  I've always had a very good
14 relationship with all of my probation officers.
15 Whenever I needed to go somewhere, it was always
16 approved.  There was no reason not to tell them.
17   Q.   Did you win or lose money at the casinos in
18 Biloxi or New Orleans?
19   A.   I don't remember.  I really don't remember.
20   Q.   Would you have disclosed your winnings to
21 probation?
22   A.   If there was any.  But again, I was going to
23 pick up my daughter, and my parents would have given
24 me cash to gamble.  It would be the same scenario.  I
25 mean, I don't make enough cash to gamble it.  They

129

1  would have to give it to me to gamble.
2    Q.   Who goes to the casinos with you?
3    A.   I don't know, various people, whoever would
4  be with me.  In this case I don't think anybody
5  because all it was was my daughter and granddaughter.
6    Q.   And when you say in this case your daughter
7  and granddaughter, you're referring to the Biloxi and
8  New Orleans trip?
9    A.   Right, trip from Florida back to Arizona.
10   Q.   What about all these numerous visits to
11 Harrah's in Joliet?  Do you go by yourself?  Do you
12 go with others?
13   A.   Always different people, people from the
14 racetrack or who knows.
15   Q.   Do you gamble at the racetrack as well?
16   A.   No.  There's no gambling at the racetrack.
17   Q.   How do your parents give you money to
18 gamble?
19   A.   They give me cash.
20   Q.   How much?
21   A.   It depends what they want to give me,
22 anywhere from, you know, a thousand to $2,000,
23 whatever they had that they wanted to gamble.  It was
24 never any set amount.
25   Q.   Who is Gary Perinar?

---

130

1    A.    Gary Perinar is one of the partners in one
2    of the Eloy land deals.
3    Q.    Have you ever used his name as an alias for
4    any purpose?
5    A.    Not knowingly.
6    Q.    Have you ever checked into the hotel or
7    casino in his name at Harrah's?
8    A.    Early on, he would have -- When I first
9    started going back for the Weber Caton, because he's
10   also a part of the Weber Caton development, he would
11   make reservations for me, and a lot of the times they
12   were in his name or in a friend of his, Mike
13   O'Grady's, name.  They would make reservations for me
14   because they had -- they could get free rooms because
15   of the points or whatever they had.
16   Q.    So who is Michael O'Grady?
17   A.    Just another associate of Mr. Perinar's.
18   Q.    Is he an investor in any real estate or
19   business venture with you?
20   A.    No.  Potential, but never materialized.
21   Q.    And Gary Perinar, is that -- There's two
22   Gary Perinars.  Is it the father or the son?
23   A.    This would be the senior.
24   Q.    Senior?
25   A.    Yes.

---

131

1    Q.    He's an investor with you in Eloy, Arizona
2    farmland?
3    A.    And Weber Caton.
4    Q.    And Weber Caton.  Any other either real
5    property or business ventures you're in with him?
6    A.    Not that I can recall, no.
7    Q.    What is 1014 Western Avenue in Joliet?
8    A.    1014 Western is where I used to live years
9    and years ago until -- I don't know, '83 or -4,
10   something like that.
11   Q.    Is that --
12   A.    A residence.
13   Q.    -- an address -- So what happened to that
14   property?
15   A.    It sold.
16   Q.    Have you ever used Western Union to wire
17   money?
18   A.    I would imagine so, yeah.
19   Q.    To whom would you be wiring money?
20   A.    I don't know.
21   Q.    For what reason might you have to wire cash
22   to someone?
23   A.    Somebody needed cash.  I'm really not sure.
24   Q.    Who is Corey Nobles?
25   A.    Corey Nobles is a friend of mine from

---

132

1    Joliet, Illinois.
2    Q.    A friend from Joliet?
3    A.    Yes.
4    Q.    Was he incarcerated in the Department of
5    Corrections in 2007?
6    A.    I believe so, but I'm not sure.
7    Q.    So why would you have wired money through
8    Western Union to Corey Nobles at the Department of
9    Corrections?
10   A.    Probably because he asked me.  He needed
11   money for something and asked me if I could send him
12   some money, loan him some money, and I agreed.
13   Q.    And if you sent him $200 in 2007, where did
14   you get that money?
15   A.    That would have came from either myself, my
16   funds that I had, or my parents, who also know him.
17   Q.    Okay.  So you're making $185 a month, and
18   yet in February of 2007 you sent $200, which is more
19   than you made, to --
20   A.    Very, very simple.
21   Q.    -- Corey.
22   A.    If he asked me for it, I went to my parents
23   and I would get it from my parents.
24   Q.    Who is Allison Kuta, K-U-T-A?
25   A.    I'm not sure.

---

133

1    Q.    In Morris, Illinois.
2    A.    I'm not sure.
3    Q.    Well, you wired her $300 in March of 2007.
4    A.    I don't know what that would be for.  It
5    doesn't ring a bell.  It could have been for somebody
6    else.  I'm really not sure.  2007, you say?
7    Q.    March 14th, 2007, $300 from Robert J. Tezak
8    to Allison Kuta of Morris, Illinois.
9    A.    I don't recall that.
10   Q.    What about Sue Coltune, C-O-L-T-U-N-E, of
11   Boynton Beach, Florida?
12   A.    When would that have been?
13   Q.    Who is that?  Do you know anyone in Boynton
14   Beach, Florida?
15   A.    When would that have been?
16   Q.    April 10th, 2007, 250 bucks to Sue Coltune.
17   A.    No, I don't remember what that's for.
18   Q.    And just a few days prior to that,
19   April 1st, 2007, Debra Coltune, also Boynton Beach,
20   Florida?
21   A.    Debra, yes.
22   Q.    And that's 350 to Debra, 250 to Susan, both
23   in April of 2007.
24   A.    I don't know who Susan is.  Debra I know.  I
25   don't know who Susan is.

---

USA VS. TEZAK                    DEP OF:   ROBERT J. TEZAK, 1/19/11

134

1    Q.   So in 2000- -- I'm sorry -- April 2007, you
2    got $600 going to the Coltunes.
3    A.   Yeah, I don't recall what it was for.  It
4    had to be to loan them money or something, in which I
5    would have went to my parents.  I don't know who Sue
6    is.  Debra I know because I went with her for a
7    number of years.
8    Q.   So is she a former girlfriend --
9    A.   Yes.
10   Q.   -- or dating relationship?
11   A.   Yes, girlfriend.
12   Q.   So $600 a month to the Coltunes, that's
13   three times --
14   A.   600 for a month, one month.
15   Q.   Understood.  But your earnings, you're
16   telling probation, are $185 a month.  So how are you
17   sending 600 a month to the Coltunes?
18   A.   How many times do I have to repeat it?  I go
19   to my parents if I need money for something, and I
20   ask them for it.  They would give it to me.
21   Q.   Okay.  April of 2007 we've got another 200
22   bucks going to Corey Nobles.  What was he
23   incarcerated for?
24   A.   You know, I really don't know.
25   Q.   How about in May of 2007, $900 to Juniper

135

1    Bank in Delaware?
2    A.   That would be a payment, I think, for one of
3    the credit cards.
4    Q.   You would have wired money to a bank to pay
5    your credit card?
6    A.   I'm not really sure what it's for, but
7    that's what it sounds like.
8    Q.   June 2007 we have another 200 bucks going to
9    Corey Nobles at the Department of Corrections.
10   A.   Mm-hmm.
11   Q.   And for what purpose?
12   A.   A request from him, I guess.
13   Q.   And in January 2008, who's David Lopez of
14   Santa Ana, California?
15   A.   I don't remember.
16   Q.   That name doesn't ring any bells?
17   A.   Not off the top of my head.  When was that?
18   Q.   $300 wired from Robert Tezak to David Lopez
19   in Santa Ana California January 17, 2008.
20   A.   No.  I'd have to check.  I don't know.  I
21   don't remember.
22   Q.   Okay.  So again, from your tax returns we've
23   got, both in the year 2007 and the year 2008, your
24   total income is $7,200, right?
25   A.   Yes.  Income was my income, period.

136

1    Q.   And so in 2007 we've got a total of $2,400
2    being wired from you to others.  I mean, where is
3    that money coming from?
4    A.   It would have came from my parents.  That's
5    the only other people who have money.  They have a
6    lot of money, my parents, and they can do what they
7    please with it.
8    Q.   So how do your parents give you money?
9    A.   Well, they don't just give me money.  I
10   mean, it's for a specific purpose or if I would ask
11   them for something like this here.
12   Q.   It seems like there's a lot of occasions
13   where you're --
14   A.   It doesn't seem like --
15   Q.   -- asking them for money, either --
16   A.   -- there's that many occasions.  What do you
17   got --
18   Q.   -- to gamble or to send to different people.
19        THE COURT REPORTER:  I'm sorry.  I can only
20   take one person at a time.
21   BY THE WITNESS:
22   A.   I don't know.  What do you have, 9, 8, 10?
23   BY MS. CHILDS:
24   Q.   Here we have hundreds of incidents of
25   gambling where you're saying it's your parents giving

137

1    you money.
2    A.   Let's not confuse the issues here.  Are you
3    asking a question about Corey Nobles, or are you
4    asking me a question about gambling incidents?
5    Q.   I'm asking you a question about both.
6    A.   One at a time.
7    Q.   Let me ask the question, and then you can
8    answer.  You've testified that your parents gave you
9    money to gamble on all of these numerous occasions --
10   A.   Numerous.
11   Q.   -- that we went through in those reports,
12   correct?
13   A.   Numerous.
14   Q.   And now we've got several incidents
15   throughout 2007 and one in 2008 where you're wiring
16   more money than you make per month to individuals.
17   A.   You're asking me a question about
18   50 gambling incidents and then trying to couple that
19   with maybe eight or ten incidents here and making it
20   sound like the same thing, which it's not.
21   Q.   I'm trying to determine how often you get
22   money from your parents.
23   A.   When I ask them for it.
24   Q.   Every day?
25   A.   No, not hardly.

138

1    Q.    Every week?

2    A.    It would get a little old every day or every

3    week.  No.  If I need it, I would ask them.

4    Q.    And how did they give it to you?  Did they

5    go to the bank and take out cash and give it to you?

6    A.    Or tell me to go get it.

7    Q.    Write you a check?

8    A.    However the case may be.  They have numerous

9    ways they can do it.

10   Q.    Letting you use their various cards?

11   A.    Cards, yeah, they can do it that way,

12   depending on what the case is and whether it was a

13   trip or what it is.

14   Q.    And are these gifts they've made to you or

15   loans?

16   A.    They would be -- I don't know what you would

17   call them, whether it be a gift or a loan.  I mean, I

18   take care of them, and they take care of me.

19   Q.    Do you ever pay them the money back?

20   A.    If it was warranted, yeah, or if I said I

21   was going to.  Whatever the arrangement was, I would

22   do.

23   Q.    Do they have you on any sort of allowance?

24   A.    No.

25   Q.    Do you have any sort of trust fund that

139

1    they've set up for you to draw from?

2    A.    No, I do not.  I wish I did, but I don't.

3    Q.    What vehicle do you drive in Arizona?

4    A.    I either drive a 2004 Buick, a 2000

5    Mercedes, or a 2005 Mercedes.

6    Q.    Let's start with the 2005 Mercedes.  What's

7    the model of that?

8    A.    SL 55.

9    Q.    And who is the owner -- registered owner of

10   the Mercedes -- 2005 Mercedes SL 55?

11   A.    My mother is the owner.

12   Q.    Okay.  You previously testified your mother

13   does not drive; is that correct?

14   A.    She doesn't have to drive to own a car.

15   Q.    Okay.  And is this the burgundy Mercedes or

16   the gold Mercedes?

17   A.    Neither one.

18   Q.    What color is it?

19   A.    It would be silver.

20   Q.    What is the 2000 Mercedes?  What model is

21   that vehicle?

22   A.    That would be an SL 500.

23   Q.    And so the 2000 Mercedes SL 500, who's the

24   registered owner of that vehicle?

25   A.    I believe my father.

140

1    Q.    And what color is it?

2    A.    Burgundy.

3    Q.    And then you previously testified your dad

4    has a 2004 Buick.  Is that --

5    A.    My dad and my mom, yeah.  I don't know who.

6    It's in both of their names.

7    Q.    You drive all three of those vehicles?

8    A.    No.

9    Q.    Does your mother drive any of them?

10   A.    She did at one time, up until a few years

11   ago.

12   Q.    When was the last time she drove?

13   A.    I can't remember.  She had a minor crash,

14   and after that she didn't drive anymore.

15   Q.    And what about your dad, which of those

16   vehicles does he drive?

17   A.    He's driven them all.

18   Q.    How often?

19   A.    Whenever he wants.

20   Q.    Does he have, like, a preferred vehicle?  Is

21   there one that's kind of his car?

22   A.    I don't think so.  He takes the Buick, I

23   guess, most of the time because it's got so much room

24   in it.

25   Q.    Who's got the insurance on those vehicles?

141

1    A.    It would be them.  You mean, which

2    companies?

3    Q.    Correct.

4    A.    I believe State Farm.

5    Q.    And what about a 2001 Oldsmobile?

6    A.    Yes.  I have a 2001 Oldsmobile that's in

7    Illinois that, God, I haven't driven in years.

8    Q.    So that one is your car?

9    A.    Yes.

10   Q.    And that's here in Illinois?

11   A.    It's in Illinois, yes.

12   Q.    Where is it stored or kept?

13   A.    It's at a garage of some friends of mine.  I

14   haven't driven it in I don't know how long.  An

15   acquaintance of mine, partner of mine, past friend of

16   mine, when I was released he bought this car for me,

17   and I owe him money for the car, which he told me

18   whenever I got it I could pay him.

19   Q.    And remind me.  Did you say you had ever

20   tried to purchase cars from D'Arcy?

21   A.    That particular car was purchased from

22   D'Arcy.

23   Q.    Any other vehicles, anything more recent?

24   A.    No.  Maybe from my father.  My father looked

25   at replacing the '04 Buick a couple of times that I

USA VS. TEZAK      DEP OF:   ROBERT J. TEZAK, 1/19/11

142

1 pursued for him, that would be about the only thing.
2    Q.   Does the 2005 Mercedes have Illinois plates
3 or Arizona plates?
4    A.   Illinois.
5    Q.   What is the license plate on that car?
6    A.   Mr. Uno.
7    Q.   Who is Mr. Uno?
8    A.   Any of us could be Mr. Uno: me, my dad, my
9 brother-in-law. We all had those type of plates.
10    Q.   So the 2005 Mercedes that's registered in
11 your mom's name has the Arizona plate Mr. Uno?
12    A.   Which one?
13    Q.   The 2005 Mercedes?
14    A.   That my mom owns would be the Illinois
15 plate.
16    Q.   Okay. So your mom's car's got Mr. Uno
17 vanity plates?
18    A.   Yeah. Why not?
19    Q.   What's the license plate on the 2005
20 Mercedes?
21    A.   They're both the same.
22    Q.   I'm sorry. 2000 Mercedes.
23    A.   It would be Mr. Uno out in Arizona.
24    Q.   So the 2000 Mercedes is Mr. Uno Arizona.
25 The 2005 Mercedes is Mr. Uno Illinois?

143

1    A.   Mm-hmm.
2    Q.   And you drive both of those vehicles?
3    A.   Yes, all three of them.
4    Q.   Have you filed any insurance claims?
5    A.   Oh, years ago when the 2000 Mercedes came
6 down from Illinois to Arizona, it went through some
7 real inclement weather where there was all kind of
8 salt and rock marks and cracked windshield. That is
9 the only thing I can think of.
10    Q.   Do you know whether either of your parents
11 have filed any insurance claims on either Mercedes?
12    A.   It's possible. I don't know.
13    Q.   What's the purpose of Weber Caton, LLC?
14    A.   Develop 112 or -13 acres of commercial
15 property.
16    Q.   And has that property already been sold?
17    A.   Some of it. It's still being developed.
18 When the economy took a turn, it's sort of at a
19 standstill, actually.
20    Q.   Are you the point of contact for Weber
21 Caton, LLC?
22    A.   One of them. I put the whole deal together.
23    Q.   So would you have been the person who
24 received payment of $599,075.93 from Menards --
25    A.   I don't believe so.

144

1    Q.   -- for Weber Caton?
2    A.   I'm sure whoever the check went to is on
3 there. It wasn't me.
4    Q.   If it wasn't you, who would know about --
5    A.   Weber Caton, LLC.
6    Q.   -- this check?
7    Right, but which of the members would have
8 been responsible for receipt, deposit, disbursement
9 of these funds?
10    A.   I don't know. Maybe Paul Bjekich, maybe
11 Terry D'Arcy, John D'Arcy.
12    Q.   Are you a signatory on any account for Weber
13 Caton, LLC?
14    A.   I don't believe so.
15    Q.   You mentioned John D'Arcy and Terry D'Arcy,
16 right?
17    A.   Yes.
18    Q.   Who is Patrick D'Arcy?
19    A.   Another partner in Weber Caton, LLC.
20    Q.   And who's Theo Benson?
21    A.   Another partner in Weber Caton, LLC.
22    Q.   How do you know them?
23    A.   Partners at Weber Caton, LLC.
24    Q.   Right, but how do you know them? How did
25 you come to do business with them?

145

1    A.   I've known them for years, years and years
2 and years.
3    Q.   Who is Greg Hill?
4    A.   Greg Hill was one of the partners in Weber
5 Caton, LLC, who I did not know. He was a friend of
6 somebody else who came into -- one of the other guys
7 who came into Weber Caton, LLC.
8    Q.   And what about Richards Kubinski?
9    A.   Richard Kubinski was another partner in
10 Weber Caton, LLC.
11    Q.   Are any of these individuals investors in
12 any of your other real properties or corporate --
13    A.   Couple of them.
14    Q.   -- entities?
15    A.   Couple of them.
16    Q.   Which of these folks are involved in which
17 of your ventures?
18    A.   Rich Kubinski is involved.
19    MR. RADAKOVICH: Asked and answered. Go
20    ahead.
21 BY THE WITNESS:
22    A.   Rich Kubinski is involved. Terry D'Arcy is
23 involved. Gary Perinar is involved. I don't know
24 who else you asked me about.
25

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

146

1  BY MS. CHILDS:
2     Q.   Are those all on the Eloy farmland property,
3  or are any of them -- -
4     A.   Some are Eloy, some are the Biltmore.
5     Q.   Okay.  Some are Eloy, some are Biltmore.
6          Who is Matthew Ramuta, R-A-M-U-T-A?
7     A.   I believe he is -- I don't know him.  I
8  think he is an investor that Paul Bjekich had brought
9  in to the Riverview, LLC, condominium project.
10    Q.   What about Kenneth Sanders?
11    A.   I don't know who that is.  It could be one
12 of those people as well.
13    Q.   Jim Alessio?
14    A.   I know the name.  I know of him.  I believe
15 it's one of the investors that Bjekich brought into
16 the Riverview, LLC.
17    Q.   And how about Howard Steffos?
18    A.   Yeah, he would be in that same group.
19    Q.   So these are all investors in Riverview,
20 LLC?
21    A.   Yes, Riverview, LLC.
22    Q.   What is the business of Riverview, LLC?
23    A.   It is a corporation that has a condo -- at
24 least one, maybe two condo developments in Arizona.
25    Q.   What's Willow Park, LLC?

147

1     A.   That's the other condo development in
2  Arizona.  There's two of them.  Riverview is one of
3  them, and Willow Park is the other one.
4     Q.   Where is Riverview located?
5     A.   I think Riverview is on Longmore Street.
6     Q.   In which city and state?
7     A.   In Mesa.  Actually, I think they're both in
8  Mesa.  One's on Longmore, and the other one I think
9  is on 8th Street or Rio Salado or something like
10 that.
11    Q.   So both in Mesa, Arizona?
12    A.   Yes.
13    Q.   Who is Mark Dawson?
14    A.   Mark Dawson is the general partner or
15 developer of Riverview and Willow Park.
16    Q.   And how do you know him?
17    A.   Mark Dawson is married to my ex-wife.
18    Q.   Which ex-wife is that?
19    A.   Nancy.
20    Q.   And we talked about Sandra, you remain in
21 touch with her.  Are you also in touch with Nancy?
22    A.   Absolutely, she's the mother of my daughter.
23    Q.   Where does Nancy live?
24    A.   She lives in Scottsdale, Arizona.
25    Q.   Do you personally or via any of these

148

1  corporate entities we've discussed today have any
2  interest in Riverview, LLC, or Willow Park, LLC?
3     A.   Tezak Investment Corporation does.
4     Q.   What is its interest in Riverview, LLC?
5     A.   We own so many percentage of each one,
6  Willow Park and Riverview.
7     Q.   What percentage of --
8     A.   I don't know.
9     Q.   Would that be in a corporate resolution or
10 the minute books?
11    A.   I'm sure it will be.
12    Q.   What about Dawson Developments, LLC, do you
13 have any --
14    A.   Dawsoma, you mean?
15    Q.   Right, Dawsoma, D-A-W-S-O-M-A.
16    A.   That would be one and the same.  I think
17 that Dawsoma is an operating company for Riverview or
18 Willow Park, one of them.
19    Q.   Do you personally or any of the corporate
20 entities for which you're an officer or a director
21 have any interest in Dawsoma Developments, LLC?
22    A.   Not that I am.  I mean, we have an interest
23 in both of those projects.  How it's exactly held, I
24 don't know.
25    Q.   When you say "we," to who are you referring?

149

1     A.   When I say "we," like I said in the very
2  beginning, it's Tezak Investment Corporation.  It is
3  not me personally, never has been.  I do not have
4  that kind of funds.  I do not have money.
5          THE COURT REPORTER:  Could we take a quick
6  break?
7          MS. CHILDS:  Sure.
8               (A short break was had.)
9  BY MS. CHILDS:
10    Q.   Okay.  Mr. Tezak, I'd like to go back and
11 look at Exhibit No. 2, which we've marked earlier
12 today.  This is the probation report of violations
13 that's currently pending before the court.  If you'll
14 turn to page 3 of 6 of this document, the first of
15 these violations alleges that you left the judicial
16 district without permission.  It specifically
17 references some travel from Philadelphia to Bermuda.
18 Is that a trip that you took?
19    A.   Not me.  I've never been to Bermuda in my
20 life.
21    Q.   Well, you had permission to travel in July
22 2009.  Where were you allowed to go?
23    A.   That would have been to Illinois.
24    Q.   Would you have purchased tickets on your
25 Robert J. Tezak credit card for anyone else to travel

**150**

1  from Philly to Bermuda?
2      A.  Not to my knowledge, no.
3      Q.  Do you frequently fly on U.S. Airways?
4      A.  Yes, I usually use U.S. Air.
5      Q.  Do you have a frequent flier number with
6  them?
7      A.  Yes.
8      Q.  Do you generally pay for your tickets using
9  the same credit card?
10     A.  Usually one of the U.S. Air cards because of
11 the points or the bonus miles and stuff.
12     Q.  Do you have a particular log-in or ID to
13 purchase tickets via their website?  How would you
14 book your tickets with them?
15     A.  I would usually just call them up.
16     Q.  Call a 1-800 number?
17     A.  Right, right.
18     Q.  Do you know a Janet Tezak?
19     A.  No, I don't.
20     Q.  Anyone by the name Janet?
21     A.  No.
22     Q.  Would you have authorized anyone named Janet
23 to use your credit card or frequent flier number?
24     A.  No, I wouldn't have.
25         MS. CHILDS:  Let's mark this one No. 15.

**151**

1          (Tezak Deposition Exhibit No. 15
2              marked for identification.)
3  BY MS. CHILDS:
4      Q.  Okay.  Have you had an opportunity to look
5  at Exhibit No. 15?
6      A.  Yes.
7      Q.  Do you recognize this document?
8      A.  Yes.
9      Q.  Have you seen this before?
10     A.  I have seen this previously.
11     Q.  And this is the companion motion that I
12 filed, the motion for rule to show cause, in
13 conjunction with this Exhibit No. 2 report issued by
14 probation.  Is that your understanding?
15     A.  Yes.  I believe I've seen this before.
16     Q.  And so regarding Violation No. 2 alleged in
17 the probation report, which is Exhibit No. 2 on
18 page 3, it indicates that you had violated the
19 condition of answering truthfully all inquiries by
20 the probation officer and to follow instructions of
21 the probation officer.  And this references a failure
22 to disclose accounts and assets to which you had
23 access, which includes a J.P. Morgan Chase account.
24 If we turn, then, to -- it looks like Exhibit E of
25 the motion, page 19 of 32 of the filing.  These are

**152**

1  some Chase account statements in the name of
2  Quentin R. Tezak or Betty A. Tezak or Robert J.
3  Tezak.  Do you recognize these account statements?
4      A.  Yes.
5      Q.  Have you had occasion to use this account?
6      A.  To pay their bills or to pay what they
7  direct me to pay.
8      Q.  Let's look at page 20 of 32 of this filing
9  where it shows ATM and debit card withdrawals, like
10 three up from the bottom.  This is an account
11 statement we're looking at for March 10th, 2010,
12 through April 9th, 2010?
13     A.  Yes.
14     Q.  It looks like on April 7th or 8th there's a
15 purchase at Mastro's Drinkwater's in Scottsdale,
16 Arizona.  What is Mastro's?
17     A.  That's a steakhouse.
18     Q.  It's, like, an upscale steakhouse, right?
19     A.  Upscale steakhouse where we've taken many
20 clients.
21     Q.  So it's $840 there.  What would that be for?
22     A.  Probably a dinner for four, five, six
23 people.
24     Q.  Who would have attended that dinner?
25     A.  I don't know.  I would have to look at that.

**153**

1  It would have been ...
2      Q.  In April of 2010.
3      A.  Yeah, it would have been people who were in
4  town for some type of event or something and people
5  who we were pursuing as an investor or something of
6  that sort.
7      Q.  And so when you say "we," you're referring
8  to a Tezak Investment Corp. --
9      A.  Tezak Investment Corporation.
10     Q.  -- dinner, but this is being paid for from
11 Quentin, Betty, and your account?
12     A.  Well, it's not my account.
13         MR. RADAKOVICH:  Objection to the
14 characterization of his account.
15 BY MS. CHILDS:
16     Q.  Well, that's what I'm trying to understand.
17 I mean, this account statement is issued -- it says
18 Quentin R. Tezak or Betty A. Tezak or Robert J.
19 Tezak.
20     A.  I said it in the beginning.  It is their
21 account with my name on it for convenience.
22     Q.  That's being used for --
23     A.  For whatever it needs to be used for for
24 their purposes, to pay their bills, take clients out
25 to dinner.  Maybe the company didn't have the funds

154

1  or our credit card at the time, whatever the case may
2  be.
3      Q.   So why wouldn't you have used one of these,
4  you know, corporate accounts?
5      A.   Because maybe they didn't have the money in
6  them.  I'm not really sure.
7      Q.   Now, Biltmore Estates that we've talked a
8  lot about is a residential real estate development,
9  correct?
10     A.   Biltmore Estates is a large area, but yes.
11     Q.   Is there also a separate Biltmore Hotel
12  that's, like, a resort property?
13     A.   Yes, yes, yes.
14     Q.   And is that adjacent to or within --
15     A.   It's across from the condo developments.
16     Q.   So the entries here for Biltmore room
17  service --
18     A.   I don't know about room service.  It would
19  have maybe been for entertainment purposes of --
20         MR. RADAKOVICH:  What page are you referring
21     to, Ms. Childs?
22         MS. CHILDS:  It's just the next page after
23     the Mastro's entry on page 21 of 32.
24  BY MS. CHILDS:
25     Q.   This is still -- This is a bank account

155

1  statement now for the next month, April 10th, 2010,
2  through May 11, 2010.
3      A.   They would deliver from the hotel over to
4  the condos.  I guess they call that room service.
5      Q.   So that could be an entry for room service.
6  Who -- Why would you have items delivered from the
7  hotel resort room service to the condos?
8      A.   Because we would have people at the condos
9  for whatever reason, whether it be pursuing them to
10  buy, be investors, or whatever the case may be, and
11  we would have things brought over for refreshments,
12  food, pizza, something like that.
13     Q.   But ordinarily each of those condo units is
14  occupied by some renter or --
15     A.   It varies.  From time to time they're
16  vacant, and we pursue the best course of business we
17  can and use them to the utmost.
18     Q.   Do you ever stay at any of those units in
19  the Biltmore?
20     A.   I have several times.  Actually, when they
21  first come on board, I usually make it a habit of
22  staying for a couple weeks at a time because that's
23  the only way you can find out what's wrong or where
24  the kinks are at.  So I spend a lot of time in them
25  in the very beginning, and then it tapers off from

156

1  there.  Now and then I stay just to check and make
2  sure everything's okay, if anything needs to be
3  replaced, this or that, whatever the case may be.
4      Q.   In which of the units have you stayed for
5  extended periods of time?
6      A.   I have stayed --
7          MR. RADAKOVICH:  Wait, wait.  What do you
8      characterize as "extended periods of time"?  I
9      mean, you have to be more specific.
10  BY MS. CHILDS:
11     Q.   Well, you just testified you had stayed
12  there for several weeks at a time, correct?
13     A.   I said a couple of weeks.
14     Q.   So can you be more specific as to how long
15  might you stay?
16     A.   Oh, after that initial visit, I wouldn't
17  stay that long anymore.  I would stay -- If there was
18  a unit available, I would stay, depending on where I
19  had meetings at the next day or what was going on or
20  what I was trying to accomplish business-wise.  I
21  would make the fullest use of any asset that we have.
22     Q.   So periodically it would not be uncommon for
23  you to be staying in any one of those units?
24     A.   Yeah, I could.
25     Q.   And when you stay there, do you pay any kind

157

1  of rent to the corporation?
2      A.   Absolutely not.  I'm working.
3      Q.   Have you stayed in each of the units?
4      A.   Yes.
5      Q.   Is there any one that you favor?
6      A.   They're all nice, from small to huge.
7      Q.   Well, Unit 103 is the big one, the jewel
8  among them, right?
9      A.   Right.  And I've stayed in the casita of
10  that, which is 500 square feet.
11     Q.   How often do you stay in the casita?
12     A.   I've probably stayed in the casita more than
13  I have in any of the other units.  Because when
14  they're rented, they're not available.  It just
15  depends on what my schedule is, what I have to do at
16  the units, what time I have to be there, what kind of
17  meetings I have downtown.  It just depends on what is
18  going on.  We make full use of the assets we have to
19  conduct our business.
20     Q.   Do you stay there often enough for neighbors
21  and security to believe that you live there?
22     A.   No.  I mean, I know security.  Neighbors, I
23  have no idea who they are.
24     Q.   Who do you know from security?
25     A.   I know everybody from security.

158

1     Q.   Any name in particular?

2     A.   Travis, Roy.  There's a couple of them I

3  can't even think of their names.  I wave at them and

4  say hi to them.

5     Q.   And so do you stay there with enough

6  frequency that the security guards would believe you

7  live there?

8          MR. RADAKOVICH:  Objection.  Wait.

9     Objection to what somebody else's state of mind

10    is.  Don't answer that question as to what

11    somebody else's state of mind is.  It's an

12    improper question.  Somebody else's state of

13    mind is not a permissible question.

14 BY MS. CHILDS:

15    Q.   How many days per month do you stay in any

16 of the units?

17    A.   I never classified it as days per month

18 because it varies.  When it's necessity and when it

19 makes sense and it's to our advantage as a company, I

20 stay there.

21    Q.   Would there be any record of that?  Is there

22 any corporate resolution or minutes or anything to

23 reflect the time that --

24    A.   Probably not.  We don't keep track of it

25 like that.

159

1     Q.   Is there one point of entry or access where

2  the security would see you come and go from?

3     A.   On 2 Biltmore there's one gate in and out,

4  and on the other units there's about four.

5     Q.   So we were looking at page 21 of 32 on this

6  Exhibit 15.  On this page there were a few entries

7  for room service, which you've explained the hotel

8  may deliver to the condo units?

9     A.   Yes.

10    Q.   What about the Biltmore SP lounge, what is

11 that?

12    A.   Could be just a lounge in the Biltmore.

13    Q.   Is there any sort of spa associated with the

14 hotel or resort?

15    A.   I think they're referring to a sport lounge.

16    Q.   Sport lounge?

17    A.   Yes.

18    Q.   Is there a Squaw Peak Lounge?

19    A.   I couldn't tell you.

20    Q.   What about the Arizona Biltmore

21 Country-something.  Is there some sort of country

22 club associated with the property?

23    A.   I don't recall.

24    Q.   Is there any kind of --

25    A.   There's a golf course there.

160

1     Q.   -- golf course?

2     A.   Yeah.

3     Q.   Would there be any occasion for -- Do you

4  golf?

5     A.   I haven't been golfing in years.  That would

6  not prevent us from having somebody else take clients

7  or perspective clients or investors golfing.

8     Q.   So you might pay greens' fees for someone

9  else?

10    A.   It's possible.

11    Q.   From this account in your parents' name?

12    A.   Whatever account had money.

13    Q.   Turning to the next page, 22 of 32.  Again,

14 about four entries up from the bottom, we've got

15 another -- this is in May of 2010 -- we've got

16 another entry at Mastro's Drinkwater's in Scottsdale.

17 This one is $767?

18    A.   One of the places we use often.

19    Q.   Is that a place you frequent for --

20    A.   I don't, but I take people to dinner there,

21 perspective clients, investors who are in town,

22 whatever the case may be, because they do a good job.

23    Q.   Do you know who you dined with on this

24 occasion?

25    A.   No.  I'd have to look.

161

1     Q.   If this was a business meeting, would there

2  be some note on the business calendar --

3     A.   I would think there would be something.

4     Q.   -- or the corporate minutes?

5     A.   I would have to look and see what it is.

6     Q.   On the next page, 23 of 32, under ATM and

7  debit card withdrawals, here you've got a couple of

8  ATM withdrawals at $500 a pop in Crest Hill.

9     A.   In July?

10    Q.   This is July of 2010.

11    A.   That would be race expenses.

12    Q.   So this was during your NASCAR trip?

13    A.   Right.

14    Q.   In July 2010.  This is you taking this money

15 out?  I mean, did your parents come on this trip?

16    A.   Sometimes they were there.  I don't know

17 exactly when this is.  But this would have been me

18 authorized to take it out for race expenses, event

19 expenses.

20    Q.   During your July 2010 NASCAR trip, did Betty

21 or Quentin travel here with you?

22    A.   They were back, but I don't know if it was

23 that July or not.

24    Q.   And then the next page, 24 of 32, again,

25 under ATM and debit card withdrawals, we've got a

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

162

1    series of those within successive days also in July
2    and within Joliet and Crest Hill.  What are those
3    transactions?
4        A.    That's just where the bank is at, Joliet or
5    Crest Hill.
6        Q.    But again, this is you withdrawing cash from
7    these ATM locations?
8        A.    It would have been race expenses -- event
9    expenses, rather.
10       Q.    Expenses of whose?
11       A.    Of the corporation.
12       Q.    So expenses of the corporation, again, being
13   taken from your parents' account?
14       A.    Could be, yeah.  They have funded the
15   corporation for a number of years.
16       Q.    Okay.  This probation report references some
17   of the documents that indicate you residing or
18   staying or spending time at the Biltmore Estates in
19   Phoenix.  So let's look at those, which are -- it
20   looks like they're contained within Exhibit B to the
21   motion.  But if we start on page 5 of 32 of this
22   Exhibit 15 that you're looking at, do you recognize
23   this document, page No. 5 of 32?
24       A.    Yes, I do.
25       Q.    And what is it?

163

1        A.    It's something on mold and water damage that
2    I probably questioned on because a unit above us had
3    flooded.
4        Q.    And so this appears to be a -- let's call it
5    a memo because it's really not on letterhead -- a
6    memo dated June 7th, 2007, regarding Fairway Lodge at
7    the Biltmore, Unit 107, mold/water damage, addressed
8    to Bob Tezak from the Fairway Lodge at Biltmore
9    Condominium Association, Sharon Rugee, community
10   manager.  Do you know Sharon?
11       A.    Yeah, I know her.  I know of her.  I don't
12   really know her.
13       Q.    Is she, like, a member of the condo board,
14   or does she work for --
15       A.    She works for the developer.
16       Q.    -- a property manager?
17             And this letter is addressed to you, Bob
18   Tezak individually, correct?
19       A.    Right.  She doesn't know any better.
20       Q.    Why wouldn't she know any better?
21       A.    Maybe she hadn't been there that long.
22   Maybe she didn't look up on who owns the unit.  I'm
23   not really sure.
24       Q.    Let's turn to the next page, 6 of 32, of
25   this Exhibit 15.  Do you recognize this document?

164

1        A.    Really, I don't.  I see what it is.
2        Q.    Okay.  Well, this appears to be an accounts
3    receivable request for waiver of some fees.  And
4    about the middle of the page it mentions homeowner
5    name, Bob Tezak?
6        A.    Totally incorrect.  You have to have money
7    to buy a condo like this.  I do not, never did.  I
8    never went and bought it, never got a mortgage for it
9    or anything else.  That is totally incorrect.
10       Q.    So why would GK Biltmore believe you to be
11   the homeowner?
12             MR. RADAKOVICH:  Wait.  Objection.  That's
13        the state of mind of somebody else.  You need to
14        call GK.  You need to ask GK whatever.  He's not
15        going to testify as to what somebody else's
16        state of mind is.
17   BY MS. CHILDS:
18       Q.    Well, earlier we had looked at a lis pendens
19   where you were named as the plaintiff in a suit
20   against GK Biltmore, and I believe you indicated that
21   was a mistake?
22       A.    Okay.
23       Q.    Is that your recollection?
24       A.    All I know is I do not own the unit.
25       Q.    And so this is a GK Biltmore form that also

165

1    indicates you are the homeowner, and is it your
2    contention that this is also a mistake?
3        A.    I would say it was a mistake.  It was filled
4    out by a person who doesn't have the knowledge that
5    they needed to have to fill it out.
6        Q.    Let's turn it page 7 of 32.  Do you
7    recognize this document?
8        A.    Vaguely.
9        Q.    Down at the bottom there's a Web address for
10   a Rossmar, R-O-S-S-M-A-R.  Do you know what Rossmar
11   is?
12       A.    That's like -- I think they're the --
13   they're employed by the developer as, I don't know,
14   maintenance or they take care of the complex.
15       Q.    Is Rossmar the property manager for Biltmore
16   Estates?
17       A.    Could be, yeah.
18       Q.    What is the community connect resident
19   database?  Is there a place where you can submit
20   requests?  If you wanted or needed something done,
21   how would you accomplish that?
22       A.    I don't know what you're referring to.
23       Q.    Up here at the top of the page it says
24   community connect resident database.  Is there any
25   kind of --

USA VS. TEZAK                    DEP OF:   ROBERT J. TEZAK, 1/19/11

166

1    A.    I have no idea.  In this particular case I
2  just went into the office.
3    Q.    So there's not any particular website for
4  the condo association where you could put in --
5    A.    There could be, I don't know.
6    Q.    What about a phone number?  Is there a phone
7  number you call to make service requests?
8    A.    Just a normal phone number of the sales
9  office or whatever if you wanted to report something
10 wrong.
11   Q.    And this -- I think you said that you recall
12 going in --
13   A.    I went into the office.
14   Q.    Where did you go?
15   A.    It was right there on the construction site,
16 the trailer.
17   Q.    These notes say Bob came in and said he
18 never received his remotes for his unit.  I gave --
19   A.    His remotes for his unit refers to --
20        MR. RADAKOVICH:  Let her ask the question,
21 Bob, please?
22 BY MS. CHILDS:
23   Q.    I gave his two remotes for his unit plus
24 traded him a remote that wasn't working February 4th,
25 2010.  Do you have any recollection of this

167

1  transaction?
2    A.    Yes, I do.  I was there.  I did it.  Let me
3  once again say that "his" and anything else that
4  relates to that relates to Tezak Investment
5  Corporation.  "His" is a figure of speech.  It's not
6  my unit.  It's not my remote.  It is Tezak Investment
7  Corporation's.  I know you've been trying to get me
8  to say that all this time, and it's not going to
9  happen.
10   Q.    For whom would you be obtaining these remote
11 devices?
12   A.    Whatever renters would be coming in.
13   Q.    From whom would the renters obtain those?
14   A.    They would get them from me, Tiffany, Mark,
15 whoever was there taking care of it.
16   Q.    So when a renter first arrives at the
17 property, how do they get in?
18   A.    Well, it would be prearranged, and we would
19 meet them somewhere there and let them in.
20   Q.    Do you exchange keys and remotes with the
21 renter at that time?
22   A.    We don't exchange keys.  We give them keys.
23 We show them around the unit and tell them to enjoy
24 their stay.
25   Q.    How do the renters return any keys or

168

1  remotes that they receive?
2    A.    We will instruct them what to do with them,
3  and that's what they do with them.  The cleaning
4  people and maintenance people follow them up.
5    Q.    Do they leave them inside a unit?
6    A.    They leave them inside the unit they were
7  in.
8    Q.    Do they return them to any office on the
9  premises?
10   A.    No, they do not.  They leave them inside the
11 unit.  They need one key to lock it and put it where
12 they're instructed to put.
13   Q.    Okay.  Let's turn to page 8 of 32 of this
14 Exhibit No. 15.  Do you recognize this document?
15   A.    Yeah.
16   Q.    What do you recognize this to be?
17   A.    A notice that the elevator wasn't working.
18   Q.    The bottom of this page also has the Rossmar
19 Web address; is that right?
20   A.    I guess.  I never use it.
21   Q.    At the top it indicates it's a call log
22 history.  Does that sound right?
23   A.    Yeah.  I mean, I'm really not sure what it
24 is.
25   Q.    This indicates date taken March 9th, 2010,

169

1  Jacqueline Yarter, from Quentin Tezak, owner, a work
2  order regarding an elevator.  The note indicates Bob
3  Tezak called and left a message the elevator near his
4  unit needs to be serviced.  I called him back to let
5  him know that I would create a work order.
6        So what inaccuracy, if any, do you perceive
7  in this document?
8    A.    Inaccuracy?  I don't know what you're
9  talking about.  What are you saying?
10   Q.    This one indicates Quentin Tezak is the
11 owner.
12   A.    Well, Quentin Tezak would be more of an
13 owner than I am because he's got all the money into
14 it.
15   Q.    But you're calling to make the complaint or
16 request?
17   A.    It could have been a dual -- I don't know if
18 he went by there or what.  Evidently I called and on
19 behalf of the Tezak Investment Corporation.
20   Q.    Let's turn to the next page, 9 of 32.  Do
21 you recognize this document?
22   A.    Vaguely.
23   Q.    And this one is dated February 8th, 2010.
24 It indicates a request from Bob Tezak taken by
25 Jacqueline Yarter.  The subject is a warranty request

170

1  form. And the note says Bob called and left a
2  message that I e-mail him a warranty request form. I
3  e-mailed it to him 2/8/10.
4           Do you recall this transaction?
5      A.  Vaguely. It would have been part of the
6  duties of my job.
7      Q.  Do you know Jacqueline Yarter?
8      A.  I know her maybe to see her and say hi. I
9  do not know her personally, no.
10     Q.  Let's turn to the next page number, No. 10
11 of 32. Do you recognize this document?
12     A.  I don't know exactly what it is, gate
13 information request.
14     Q.  Do you recognize the handwriting on this
15 document?
16     A.  That would be me.
17     Q.  Is that your handwriting?
18     A.  Yeah.
19     Q.  This appears to be a gate information
20 request for 2 Biltmore Estates. Towards the middle
21 of the page there's a check-the-box form, and there's
22 an X through the box for new resident; do you see
23 that?
24     A.  Okay. I see that.
25     Q.  And then where it says resident name, it

171

1  says Robert Tezak; do you see that?
2      A.  Yes.
3      Q.  And again, you filled out this form
4  yourself?
5      A.  Yeah. They asked me to fill it out. I did.
6      Q.  And you identified yourself as the resident?
7      A.  I am not the resident. I have never been
8  the resident. I am not the owner. I have never been
9  the owner. It's Tezak Investment Corporation.
10     Q.  But I'm saying on this form where it says
11 resident name, you filled out the form with your name
12 as the resident; is that correct?
13     A.  Could have been if that's what they asked me
14 to do, for whatever reason they were asking me to do
15 it.
16     Q.  And beneath your name there's a question:
17 Do you want your name to show on the screen for
18 visitors? There's an X through no.
19     A.  Right, because we don't want any name there,
20 period.
21     Q.  And this is for Unit 103?
22     A.  Correct.
23     Q.  Turning to the next page, 11 of 32. Do you
24 recognize this form?
25     A.  Vaguely. This kind of stuff goes on all the

172

1  time with units.
2      Q.  Okay. So this appears to be a similar form
3  to the last one we looked at. Again, it's captioned
4  gate information request for 2 Biltmore, although
5  this one has the box checked for existing resident
6  instead of new resident; is that right?
7      A.  Yeah, whatever that is. I don't know if I
8  checked that.
9      Q.  Is this your signature at the bottom of the
10 page?
11     A.  Yes. That would be mine. This is not mine.
12         MR. RADAKOVICH:  He's pointing to the
13     resident name printed, Bob Tezak.
14 BY THE WITNESS:
15     A.  I don't think these checks are mine either.
16 BY MS. CHILDS:
17     Q.  Who would have completed this form for or
18 with you?
19     A.  Whoever sent it or gave it to me.
20     Q.  Where would you go to fill out this form?
21     A.  Either at the construction site office
22 trailer that is there or the clubhouse fairway lounge
23 or they sent it in the mail or faxed it.
24     Q.  Do you know many of your neighbors, many of
25 the neighbors of the units in the Biltmore Estates?

173

1      A.  I don't think I know any of them.
2      Q.  Any one you would name as a reference?
3      A.  No, I don't know any of them that well.
4      Q.  Mr. Tezak, you're the officer of how many
5  corporate entities total?
6      A.  Just the two that I can recall, Tezak
7  Investment and Tiffmark Network. I don't believe I'm
8  an officer on Weber Caton. Possibly, but I don't
9  believe I am.
10     Q.  And Tezak Investment Corp. has how much
11 dollar value inventory in real estate?
12     A.  It depends. Today it would be dramatically
13 different than it was, say, three or four years ago.
14     Q.  And so you manage the day-to-day operations
15 for the Tezak Investment Corp. real estate holdings.
16 How much is that worth?
17     A.  Today or five years ago?
18     Q.  Well, let's do both, compare and contrast.
19 Five years ago it was how much?
20     A.  Five years ago, probably substantial. I'd
21 have to figure it out.
22     Q.  And what is it today?
23     A.  Probably maybe half of that, two-thirds of
24 it. I'd have to sit down and figure it out.
25     Q.  Are we talking about hundreds of thousands

USA VS. TEZAK                          DEP OF: ROBERT J. TEZAK, 1/19/11

174

1  of dollars or --
2      A.   We're talking about millions.
3      Q.   -- millions of dollars?  Single-digit
4  millions or double-digit millions?
5      A.   I would say probably -- Tezak Investment
6  Corporation, I would say probably double, low double.
7      Q.   More than 10, less than 20 million?
8      A.   I would say between 10 and 20.  I think at
9  one time it was up over 30.
10     Q.   And that would include Tezak Investment
11  Corp.'s interest in these other entities we've
12  mentioned, Riverview --
13     A.   Riverview, everything.
14     Q.   -- Weber Caton, all of these other entities
15  in which Tezak Investment has any interest in?
16     A.   Yes.
17     Q.   Let's take a look at Exhibit No. 1, the
18  first document we showed you today.  It's the notice
19  to appear for judgment debtor exam.  This one also
20  requested production of a number of documents.  What
21  steps did you undertake to locate these items?
22     A.   I have them.
23     Q.   And where did you go to find them?
24     A.   In our files.
25     Q.   Are these documents that were maintained in

175

1  the office --
2      A.   Yes.
3      Q.   -- at 2340 South Standage?
4      A.   Yes.
5      Q.   Is there a particular file cabinet or
6  location where you keep this stuff?
7      A.   We have probably three files, four files.
8  We have a one-room office.
9      Q.   So let's take a look at what you brought
10  with you today.
11     A.   I didn't see anywhere where you put your
12  salary in here.
13     Q.   It's actually on the last page of the
14  financial statement.
15     A.   Okay, because I was looking for it there.  I
16  didn't see it.  So I need to add because there's only
17  one of them on here.  I didn't put the $900 on there.
18     Q.   Okay.  You can take an opportunity to do
19  that.
20          Okay.  So you've just tendered to me in
21  reference to Item No. 1 a completed original of the
22  financial statement of debtor; is that correct?
23     A.   Correct.
24     Q.   You've taken an opportunity to review this
25  today and make any changes based on anything we've

176

1  talked about, right?
2      A.   Yes.
3          MS. CHILDS:  Let's mark this one 16.
4              (Tezak Deposition Exhibit No. 16
5               marked for identification.)
6  BY MS. CHILDS:
7      Q.   How about any responsive documents to
8  request No. 2, complete copy of all employment
9  records relating to the debtor including --
10     A.   I didn't know what you were talking about,
11  employment records.  I don't have any employment
12  records.  I'm employed at Tezak Investment
13  Corporation and Tiffmark Network.  I don't have
14  employment records.  I have check stubs.
15     Q.   So apart from the check stubs that you've
16  provided to probation or the tax returns we've
17  discussed here today, do you have any other document
18  that evidences your employment arrangement with
19  either Tezak Investment Corp. or Tiffmark Network,
20  Inc.?
21     A.   I don't understand what you're asking.
22     Q.   Do you have any sort of employment agreement
23  with either of these entities?  Is there anything --
24     A.   Yeah, I do have an employment agreement.  I
25  don't know if it's here or not.  I do have one,

177

1  though.  I can supply that for you.
2      Q.   Okay.  We will need a copy of whatever
3  employment agreement you have with any of these
4  entities we've discussed today.
5      A.   I believe there's only the one.
6      Q.   Okay.  Also any operating agreement that
7  would indicate what your membership interest is in
8  any of these LLCs we've discussed.
9      A.   I don't have any membership interest, but I
10  have an agreement that at some point when this land
11  is being sold off I would get a commission.
12     Q.   Okay.  That is evidence of compensation
13  perhaps due you; and so, yes, we do require
14  production of that document.
15     A.   Okay.
16     Q.   Item No. 3, business records for the present
17  and past calendar year reflecting assets,
18  liabilities, gross receipts and expenses for any sole
19  proprietorship, partnership, or corporation in which
20  you have any interests.
21     A.   All I have is -- I don't know if you're
22  talking about something like this, the Merrill Lynch
23  account.
24     Q.   Okay.  We've already made a request for the
25  corporate resolutions, minute books and records for

178

1  Tezak Investment and Tiffmark Network.
2      A.  Yes.  Earlier, you're talking about?
3      Q.  Yes.  Any Social Security records indicating
4  your prior earnings or benefits that may be due you.
5  Do you get one of those kind of annual summary
6  earning statements from Social Security?
7      A.  I probably do, but I don't know where it's
8  at.  I can search for it.  I'm sure it's probably in
9  the file.
10     Q.  How old are you?
11     A.  62.
12     Q.  When do you anticipate you'll be able to --
13  eligible to receive Social Security?
14     A.  I've never thought about it or checked into
15  it.  I'm not retiring.
16     Q.  We'll need you to produce that Social
17  Security statement.  If you can't find that at home,
18  we have a form you can fill out.
19         MR. RADAKOVICH:  It's going to be easier to
20         fill out a form.
21  BY THE WITNESS:
22     A.  Tiffany may know where this stuff is filed.
23  I was looking through everything without her help
24  because she wasn't there.  She was out of town.  She
25  may be able to go right to it.

179

1  BY MS. CHILDS:
2      Q.  Then we've got the last three federal,
3  state, local income tax returns.  I know we reviewed
4  '06, '07, '08.
5      A.  This is '07 and '08.  This is the original.
6  That's the only thing I have on '09.  I think it's
7  misfiled.  I do have it, and I did file it.  I did
8  send it in.  But this is what I have as far as the
9  '09 goes.
10     Q.  So you filed for '09?
11     A.  Yes.
12     Q.  I know 2010 is not due yet, but have you
13  prepared it?
14     A.  Oh, God, no.
15     Q.  Will James Halstead & Associates --
16     A.  Yes.
17     Q.  -- be your accountant for 2010 as well?
18     A.  I believe so, yes.
19     Q.  Bank statements for -- Item No. 6 is bank
20  statements for the last 12 months from all banks or
21  financial institutions.  I just noticed on your Sam's
22  Club card it indicates Robert Tezak for Tezak Funeral
23  Home.  Are you an employee, officer, or director of
24  Tezak Funeral Home?
25     A.  No.  No, not at all.  It's just as a

180

1  courtesy, they let us use the card.
2      Q.  At one time you were the coroner for Will
3  County, correct?
4      A.  Correct.
5      Q.  Do you have any county or municipal pension
6  or retirement fund associated with that?
7      A.  State of Illinois Retirement Fund.
8      Q.  Illinois State Employees Retirement?
9      A.  Something like that, yeah.
10     Q.  Or is it the County Municipal Benefit Fund?
11     A.  I think it's the Illinois State something.
12     Q.  Do you get any sort of statement to reflect
13  that?
14     A.  I'm sure we have -- I have some kind of
15  statement we could get to you.
16     Q.  We need that too.
17         THE WITNESS:  You'll have to put this in
18         writing.
19         MR. RADAKOVICH:  She's going to send it to
20         me in writing.
21  BY THE WITNESS:
22     A.  Okay.  Just so I have a list of it.
23  BY MS. CHILDS:
24     Q.  Sure.
25     A.  With my daughter back -- Now she's away.

181

1  She'll be back in the office, actually, tomorrow.  It
2  will be much easier for me because some of the stuff
3  is either misfiled or filed on her system that I just
4  couldn't find.
5      Q.  Okay.  The bank statements, will you give --
6  Oh, she's copying them.
7         Item 7, all trust agreements in which you're
8  named trustor or trustee or beneficiary.
9      A.  Yeah, there's none of those.
10     Q.  Are you a beneficiary of your parents'
11  trusts?
12     A.  No.  Actually, for the these specific
13  reasons I am not:  When they pass, they have a will
14  with a spendthrift clause in it.  I am allowed to use
15  a portion of the income as long as it doesn't get
16  attached.  If it gets attached, I don't get it and it
17  goes right to the kids.  I don't get any of the
18  estate.  That goes directly to the grandchildren.
19     Q.  Okay.  We're going to need a copy of that
20  will that memorializes this agreement you've just
21  described to me.
22     A.  Okay.  Well, that's not coming from me.
23         MR. RADAKOVICH:  We'll make the request.  I
24         can't promise that I can produce somebody else's
25         will.

182

```
 1   BY THE WITNESS:
 2       A.   Yeah, they're pretty adamant about this
 3   entire situation.
 4   BY MS. CHILDS:
 5       Q.   If they prefer to come in, we'll be glad to
 6   talk with them as well.
 7       A.   I know.  They're not going to spend their
 8   money on --
 9       Q.   Item No. 8 is all deeds, leases, contracts
10   and other documents representing ownership interest
11   in real property, deeds of trust, mortgages, any
12   other liens on any real property.
13       A.   I don't have any real property.
14       Q.   And this would be just what we find in the
15   public records regarding Tezak Investment Corp?
16       A.   That's correct.
17       Q.   Item 9, all stocks, bonds, or other
18   securities of any class the debtor and any business
19   in which the debtor has any interest may own or have
20   issued.  You produced to us your Merrill Lynch
21   account statement.  Any other --
22       A.   That's it.
23       Q.   -- retail, brokerage, or investment accounts
24   anywhere?
25       A.   Maybe years and years ago, not anymore.
```

183

```
 1       Q.   Any other individual stocks that you own?
 2       A.   Not to my knowledge, no.
 3       Q.   Any savings bonds, T-bills, stock
 4   certificates, paper money of any kind in a garage, a
 5   basement, storage, anywhere?
 6       A.   No.
 7       Q.   Number 10, all life insurance policies in
 8   which you're insured or beneficiary?
 9       A.   These two.
10       Q.   New York Life and --
11       A.   New York Life and Prudential.  I'll have to
12   get you -- one of them has the updated one.  The
13   other one is not current.
14       Q.   I'll have her make copies of those when she
15   gets back.
16            11, all promissory notes held by the debtor
17   and other documents evidencing any money owed to the
18   debtor now or in the future.  Any of those?
19       A.   (Nonverbal response.)
20            MR. RADAKOVICH:  You have to answer yes or
21   no.
22   BY THE WITNESS:
23       A.   No.
24   BY MS. CHILDS:
25       Q.   Any loans that any of these corporate
```

184

```
 1   entities or LLCs we've discussed today -- any loans
 2   any of them have made to you?
 3       A.   I don't believe so.  I'll double-check, but
 4   I don't believe so.
 5       Q.   Any promissory notes outstanding where you
 6   owe anyone money?
 7       A.   Well, I do owe on that Oldsmobile car.
 8       Q.   Okay.  What about any loans that the
 9   corporations or LLCs have made to others?  Is there
10   money that's due or owing to Tezak Investment
11   Corporation?
12       A.   Not to me.
13       Q.   What about any potential accounts receivable
14   to Tezak Investment Corporation?
15       A.   Not that I know of.
16       Q.   Item 12, all financial statements furnished
17   by the debtor in the last 36 months.  You completed a
18   financial statement for us here.  I think we've
19   obtained the last three years of your probation
20   disclosures through them.  Have you made any
21   financial disclosures to any other third party?
22       A.   No.
23       Q.   Any applications for loans or credit for you
24   personally?
25       A.   No, outside of the credit cards that you
```

185

```
 1   know of.
 2       Q.   Okay.  Item 13, all deeds, bills of sale, or
 3   other documents prepared in connection with any
 4   transfer made by the debtor or any business in which
 5   the debtor has any interest either by gift, sale, or
 6   otherwise in the last six year?
 7       A.   No.
 8       Q.   Any property bought or sold by Tezak
 9   Investment Corp. in the last six years?
10       A.   By them, yeah, but not by me.
11       Q.   When was the last real estate transaction
12   that was completed by Tezak Investment Corp.?
13       A.   Bought or sold?  I would say bought,
14   probably in the last three years; sold, four to five
15   years.
16       Q.   And what's the status of its current
17   holdings?  Are those properties listed for sale, or
18   do you anticipate that --
19       A.   They are listed for sale.  We're constantly
20   pursuing more investors.  Everything is so up in the
21   air right now, it's hard to tell what would happen.
22       Q.   14, any documents relating to any lawsuit or
23   legal action brought by the debtor.  Apart from the
24   one we looked at earlier today where you've sued GK
25   Biltmore, are you a plaintiff in any other lawsuit?
```

USA VS. TEZAK                    DEP OF:  ROBERT J. TEZAK, 1/19/11

186

1    A.   I put a question mark there.  I'm not really
sure.  I don't believe so.  The company may be, and I
don't know if that -- if I'm named or not for sure.
But it would be strictly on their business, nothing
to do with me.  They can name me all they want, but
it's on that business.

7    Q.   Who would know that?

8    A.   I would have to take a look.  I put a call
in to our attorney in Phoenix, but I couldn't reach
him.  He was unavailable.

11    Q.   Would all of that litigation be handled by
the --

13    A.   Polsinelli Shughart, right.

14    Q.   Any other lawsuit where you've sued someone
and might recover money?  It could be a slip and
fall, a car accident, medical malpractice, anything.

17    A.   No.  And again, that's why I did put -- if
you see the question mark there, that's why I put it
there.  I didn't talk to them and I didn't know for
sure what I should put.

21    MS. CHILDS:  Okay.  If you want to take a
quick break, I'll review my notes.  She'll get
you copies of this.  I don't anticipate -- Are
you going to have any follow up, Dan?

25    MR. RADAKOVICH:  No.

---

187

1    (A short break was had.)

2    MS. CHILDS:  I think we can go ahead and
conclude if you don't have any follow up.  If
you don't have any follow up, do you want to
reserve or waive signature?

6    MR. RADAKOVICH:  Reserve.

7    (WHEREUPON, signature was reserved
and the witness was excused.)

---

188

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
    vs.                        )  No. 92 CR 652-5
                               )
ROBERT J. TEZAK,               )
                               )
            Defendant.         )

I, ROBERT J. TEZAK, state that I have read
the foregoing transcript of the testimony given by me
at my deposition on the 19th day of January, 2011,
and that said transcript constitutes a true and
correct record of the testimony given by me at said
deposition except as I have so indicated on the
errata sheets provided herein.

_____
        ROBERT J. TEZAK

SUBSCRIBED AND SWORN to
before me this _____ day
of _____, 2011.

_____
    NOTARY PUBLIC

---

189

CERTIFICATE

I, Kathy A. O'Donnell, a Registered Professional
Reporter, do hereby certify that the foregoing
witness, ROBERT J. TEZAK, was duly sworn on the date
indicated, and that the foregoing is a true and
accurate transcription of my stenographic notes and
is a true record of the testimony given by the
foregoing witness.

I further certify that I am not employed by or
related to any party to this action by blood or
marriage and that I am in no way interested in the
outcome of this matter.

In witness whereof, I have hereunto set my hand this
4th day of February, 2011.

_Kathy O'Donnell_

KATHY A. O'DONNELL, CSR, RPR
CSR No. 084-004466